The Honorable Richard A. Jones

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KEITH HUNTER, an individual, and
ELAINE HUNTER, an individual

                Plaintiffs,

     v.

BANK OF AMERICA, N.A.;

NATIONSTAR MORTGAGE, LLC, a
Delaware limited liability company;

HSBC BANK USA, N.A., as Trustee for
Merrill Lynch Mortgage Investors, Inc.,
Mortgage Pass-Through Certificates,
MANA Series 2007-OAR2;

QUALITY LOAN SERVICE
CORPORATION OF WASHINGTON, a
Washington corporation;

                Defendants.

NO. 2:16-cv-01718-RAJ

THIRD AMENDED COMPLAINT

JURY DEMAND

## I    INTRODUCTION

Plaintiffs Keith Hunter and Elaine Hunter bring this action against the Defendants for committing unfair and deceptive acts in violation of the Consumer Protection Act during the course of servicing the mortgage loan on their home. Through this lawsuit, the Hunters seek relief for the injury and damages incurred as a

THIRD AMENDED COMPLAINT - 1

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

result of Defendants' conduct.  The foreclosure sale of Plaintiffs' home is presently stayed subject to Court order.

## II   PARTIES

1.      Plaintiff Keith Hunter is an unmarried person who resides in King County, Washington at property located at 7022 NE 170th Street in Kenmore, Washington ("the property").

2.      Plaintiff Elaine Hunter is an unmarried person who resides in King County.  Plaintiff Elaine Hunter and her husband, Donald Hunter, entered into a promissory note secured by a deed of trust concerning the property.  Elaine Hunter and Donald Hunter are Keith Hunter's parents.  Donald Hunter is deceased.

3.      Defendant Bank of America, N.A., is a national bank that conducts business within the State of Washington.  Bank of America serviced the loan on the property through 2012.

4.      Defendant Nationstar Mortgage LLC is a Delaware limited liability company that conducts business within the State of Washington.  Nationstar began servicing the loan in 2014 and continues to do so to this day.

5.      Defendant HSBC Bank USA, N.A. as Trustee for Merrill Lynch Mortgage Investors, Inc., Mortgage Pass-Through Certificates, MANA Series 2007-OAR2 ("HSBC") is a national bank.  HSBC claims to be the current beneficiary under the deed of trust.

6.      Defendant Quality Loan Services Corporation of Washington ("QLS") is a Washington corporation that conducts business within the State of Washington.  QLS is the foreclosure trustee on the property.

THIRD AMENDED COMPLAINT - 2

1

2          ## III    JURISDICTION AND VENUE

3          7.      Plaintiffs filed suit in King County Superior Court asserting jurisdiction

4   over the subject matter and parties pursuant to RCW 2.08.010 and venue pursuant to

    RCW 4.12.010.

5          8.      On November 4, 2016, Defendant Bank of America removed this matter

6   from King County Superior Court to the U.S. District Court for the Western District of

7   Washington.  *See* Dkt. No. 1.

8          9.      In its removal notice, Bank of America alleged that the Court has

9   jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. § 1332 and

10  28 U.S.C. §§ 1441 and 1446.

11         ## IV    FACTUAL BACKGROUND

12         10.     On March 27, 1996, Donald and Plaintiff Elaine Hunter acquired the

13  property by statutory warranty deed.

14         11.     The property was purchased subject to a promissory note that was

15  secured by a residential real estate mortgage.

16         12.     The property was purchased for Plaintiff Keith Hunter.

17         13.     Keith Hunter began living on the property soon after it was purchased.

18         14.     He used the property as his primary residence and took responsibility

19  over maintaining it.

20         15.     Keith Hunter and Elaine Hunter made regular payments on the property.

21         16.     Keith Hunter's parents gave him rights to the property in 2003.

22         17.     Keith Hunter continues to reside on and use the property as his primary

23  residence to this day.

24         18.     The property has been refinanced on several occasions.

25         19.     The most recent occurred in 2006 through Countrywide.

26

27

THIRD AMENDED COMPLAINT - 3                    BRESKIN | JOHNSON | TOWNSEND PLLC
                                               1000 Second Avenue, Suite 3670
                                               Seattle, Washington 98104  Tel: 206-652-8660

20.     Elaine and Donald Hunter entered into a promissory note with Countrywide that contained a principal balance of $1,000,000.

21.     The promissory note imposed a fixed interest rate of 7.25 percent for the initial 5 years of the loan term, followed by an annual adjustment according to the LIBOR index plus 2.25 percent.  *See* Exhibit A attached hereto.

22.     The monthly minimum payment for the initial 5 years of the loan was interest only.

23.     The monthly minimum payment amount under the note was $3,822.46.

24.     This amount paid only a portion of the interest owed.

25.     The note allowed the remaining interest to be added to the principal up to 115 percent of the amount borrowed, or an additional $150,000.00 (the Maximum Negative Amortization Cap) for a total principal balance of $1,150.000.00.

26.     If the principal balance is reached $1,150,000 prior to February 1, 2012, a new minimum payment amount is calculated with a 5 percentage point reduction in the interest rate.

27.     However, if the principal balance did not reach $1,150,000.00 prior to February 1, 2012, the minimum payment remained interest only but is modified according to an interest rate adjustment effective at that time according to the LIBOR index plus 2.25 percent, and annually thereafter.

28.     If the principal balance of the loan did not reach $1,150,000.00 by February 1, 2017, the loan must be "recast."

29.     When the loan is recast, the minimum payment amount adjusts again so that the minimum payment amount includes an amount necessary to pay the loan off, in full, by its maturity date of February 1, 2037.

30.     Under Truth in Lending Act disclosures, late fees were capped at 5 percent of the amount of an overdue payment.

THIRD AMENDED COMPLAINT - 4

31.     The promissory note is secured by a deed of trust recorded in King County under Auditor's File No. 2007011000985.   In 2007, the Hunters' loan was securitized.

32.     The loan was bundled with other residential mortgages and converted to a mortgage-backed security through a process referred to as securitization.

33.     The mortgage-backed security that included the Hunters' loan was sold on the secondary market to a trust overseen by Defendant HSBC.

34.     When the pool of loans was securitized, the trust contained more than $607,000,000 in assets.

35.     At the time, the trust included approximately 63 mortgage loans from homeowners in Washington.

36.     HSBC claims to be the "beneficiary" of the loan under Washington's Deed of Trust Act.

37.     As beneficiary, HSBC was assigned some or all of Countrywide's interests, rights, and responsibilities set forth in the promissory note.

38.     As trustee, HSBC's responsibilities are set forth in several documents, including, but not limited to, a Pooling and Servicing Agreement dated March 1, 2007, a Free Writing Prospectus dated March 19, 2007, a Prospectus dated March 22, 2007, a Prospectus Supplement dated March 28, 2007, and various related agreements and publicly available filings with the Securities and Exchange Commission applicable to the MANA Series 2007-OAR2 pool of mortgage loans.

39.     HSBC is paid an annual fee to oversee the trust.

40.     HSBC's duties include overseeing the servicing of loans contained in the MANA Series 2007-OAR2 pool of mortgage loans.

41.     As trustee, HSBC was obligated to ensure that servicing complied with the mortgage loan transaction documents, the pooling and servicing agreement, free

THIRD AMENDED COMPLAINT - 5

writing prospectus, prospectus supplement, and state and federal laws governing the servicing of residential mortgages.

42.     As beneficiary, HSBC was obligated to ensure that servicing complied with the mortgage loan transaction documents and state and federal law governing the servicing of residential mortgages.

43.     When the pool of loans was securitized, Wells Fargo Bank, N.A., was identified as the master servicer of loans within the pool.

44.     IndyMac Bank, F.S.B., Countrywide Home Loans Servicing LP, and Wilshire Credit Corporation acted as 'sub-servicers.'

45.     Subsequently, Bank of America, Specialized Loan Servicing, and Nationstar serviced loans within the pool, including the Hunters' loan.

46.     HSBC failed to adequately oversee the servicing of loans within the pool.

47.     HSBC did not ensure that Bank of America and Nationstar serviced loans within the pool consistent with the mortgage loan transaction documents, pooling and servicing agreement, free writing prospectus, prospectus supplement, and state and federal law governing the servicing of residential mortgages as set forth in more detail below.

48.     HSBC's failure to ensure that Bank of America and Nationstar serviced the loans consistent with the mortgage loan transaction documents, pooling and servicing agreement, free writing prospectus, prospectus supplement, and state and federal law governing the servicing of residential mortgages resulted in servicing that was disorderly, capricious, inconsistent, dilatory, and inattentive.

49.     Between 2012 and 2014 alone, three separate entities serviced the Hunters' loan.

50.     HSBC's lack of adequate oversight impaired the Hunters' efforts to resolve issues that arose during the servicing of their loan.

THIRD AMENDED COMPLAINT - 6

51.    Bank of America began servicing the mortgage sometime after it acquired Countrywide in 2008.

52.    Bank of America was assigned some or all of Countrywide's interests, rights, and responsibilities under the promissory note.

53.    Bank of America sent the Hunters monthly payment invoices that identified the amount due and payment due date.

54.    Keith Hunter and Elaine Hunter sent checks to Bank of America for the amount identified on the payment invoices.

55.    Bank of America received these checks and deposited them.

56.    However, beginning in late 2011, Bank of America began sending the Hunters checks endorsed to Elaine Hunter in the amount the Hunters had just been invoiced.

57.    Bank of America did not credit the Hunters' payments to their mortgage account.

58.    Bank of America's actions caused the loan to default.

59.    Seeking an explanation, Keith Hunter called the Bank of America customer service line several times.

60.    On each occasion, Mr. Hunter spoke with different employees in various departments.

61.    He was told to pay different amounts by different people.

62.    Without clear instruction, the Hunters maintained their practice of sending Bank of America checks for the amount identified on the payment invoices they received.

63.    Bank of America accepted these checks, deposited them, and then sent checks to Elaine Hunter for the amount that had been paid for the mortgage.

THIRD AMENDED COMPLAINT - 7

64.     Bank of America refused to credit these payments to the Hunters' mortgage account.

65.     Although the Hunters tried to correct the issue, Bank of America provided inconsistent information about how to do that.

66.     Bank of America _internally_ adjusted the monthly payment terms on the note.

67.     This adjustment was made on or about November 1, 2011, prior to the loan reaching the Maximum Negative Amortization Cap and prior to the initial adjustment date set forth in the promissory note.

68.     Bank of America did not tell the Hunters that it had internally – and incorrectly – adjusted the payment terms of the loan.

69.     Bank of America also did not take action to correct its premature adjustment of the loan.

70.     Instead, Bank of America disseminated false information to the Hunters about their loan.

71.     For instance, Bank of America stated in a notice to the Hunters dated August 15, 2011 that the interest rate effective February 1, 2012 was 7.25 percent.

72.     In fact, the interest rate effective February 1, 2012 under the terms of the note was approximately 3.375 percent.

73.     Bank of America also imposed late fees and excessive charges against the loan despite the Hunters never having missed a monthly payment on the mortgage.

74.     These late fees and charges exceeded the amounts sent forth in the Truth in Lending Act disclosures.

75.     Without an understanding of what adjustments Bank of America had made internally, the Hunters continued contacting Bank of America.

THIRD AMENDED COMPLAINT - 8

76.     They hoped Bank of America would eventually explain and correct whatever had gone wrong.

77.     Eventually, the Hunters were directed to Paul Mills, a vice president and mortgage specialist at Bank of America who maintained an office in Seattle.

78.     Keith Hunter set up an in-person meeting with Mr. Mills.

79.     The Hunters hoped for an explanation about Bank of America's failure to credit their mortgage payments to their account.

80.     They also intended to discuss modifying the loan's payment terms by reducing the interest rate.

81.     Mr. Hunter and his mother met with Mr. Mills at a Bank of America branch in Everett in February 2012.

82.     Mr. Mills could not explain why the Hunters' checks were being returned.

83.     He told them not to worry about it.

84.     It is unclear why Mr. Mills did not then (or ever) investigate what actions Bank of America had taken internally to cause the Hunters' loan to default.

85.     Instead, Mr. Mills   encouraged the Hunters to apply for a loan modification.

86.     He told them to collect and produce various documents and information to support their application for a loan modification.

87.     The Hunters did so.

88.     The Hunters' application included a written statement that the account was in error.

89.     While the application was pending, the Hunters continued to make payments on the property.

90.     These payments were deposited and then returned to the Hunters in the form of checks endorsed to Elaine Hunter.

THIRD AMENDED COMPLAINT - 9

91.     In June, the Hunters received a letter indicating that they met criteria for a new loan modification program.

92.     The letter stated, "you meet the criteria required to apply for a new modification program recently announced as a result of the U.S. Department of Justice and State Attorneys General global settlement with major servicers, including Bank of America."

93.     The letter touted the programs benefits, which provided "qualified customers significant principal reduction and reduce monthly payments by an average of 35%."

94.     This program would have benefited the Hunters by significantly reducing the principal balance of their loan and make it eligible for another federal loan modification program, the Home Affordable Modification Program ("HAMP").

95.     The program also would have waived late fees, add interest and advances to the principal and the "your loan will be brought up to date."

96.     The letter invited the Hunters to contact a specialist.

97.     Contact information for the specialist was the same as Mr. Mills's.

98.     The Hunters were confused because they were already working with Mr. Mills and thought that Bank of America was already processing their application.

99.     However, the letter reinforced Mr. Mills's assertion that the Hunters' loan would be modified.

100.    The letter also reinforced the Hunters' beliefs that Bank of America would modify their loan.

101.    The Hunters spoke with Mr. Mills on several occasions during the Spring of 2012.

102.    On each of these occasions, Mr. Mills assured the Hunters that the modification was processing.

THIRD AMENDED COMPLAINT - 10

103.   At one point, the Hunters had to submit additional copies of documentation to Bank of America.

104.   Mr. Mills continued to assure them that they were "going to get a modification."

105.   He again told them not to worry about the checks they were receiving from Bank of America.

106.   Although Mr. Mills assured the Hunters that the modification was processing, Bank of America took limited or no action on the application. Mr. Mills also told the Hunters that they would benefit from the global settlement Bank of America had entered into with the Department of Justice.

107.   Even though Bank of America had already determined that the Hunters were eligible for the program and was already in possession of sufficient information to evaluate the Hunters' for assistance under the program, Bank of America did not actually consider their loan for benefits under the program.

108.   Bank of America did not notify the Hunters that it was not considering their loan for program benefits.

109.   This deprived the Hunters of the right to appeal an adverse decision.

110.   Bank of America delayed processing the application for months

111.   By August, the Hunters were very concerned about the status of their application.

112.   They set up an in-person meeting with Mr. Mills on or about August 10 at a Bank of America branch in Everett.

113.   The Hunters brought with them a check made out to Bank of America in the amount they had been invoiced, $4,390.35.

114.   The Hunters asked Mr. Mills to deposit the check.

115.   Mr. Mills refused.

THIRD AMENDED COMPLAINT - 11

116.   He stated, "Don't bother, you have a new mortgage coming, it's on the underwriter's desk."

117.   Mr. Hunter expressed concern given the delay.

118.   But Mr. Mills insisted that the Hunters would have a "new mortgage by September."

119.   When pressed about Bank of America's refusal to credit the Hunters' checks to their mortgage account, Mr. Mills stated that, it was just a case of "one hand not talking to the other."

120.   The Hunters relied on this representation.

121.   A few weeks later, Mr. Hunter followed up with Mr. Mills to find out the status of the modification.

122.   Mr. Mills stated that the modification would not occur because Bank of America had sold the note.

123.   He advised Mr. Hunter that there was nothing more he could do to help him.

124.   The Hunters were stunned.

125.   Bank of America characterized the loan as in default and continued servicing the property until November 2012.

126.   Without clarity, the Hunters continued sending Bank of America checks according to the amount they were invoiced.

127.   Bank of America sent the Hunters a notice on October 31, 2012 stating that the interest rate in effect at the time was 7.25 percent.  *See* Exhibit B attached hereto.

128.   But the interest rate that was in effect at the time under the terms of the note was approximately 3.375 percent.

THIRD AMENDED COMPLAINT - 12

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

129.   Bank of America made other false statements in written communications with the Hunters regarding the loan's interest rate, payment terms, and amounts owed.

130.   The Hunters suffered damages as a result of Bank of America's misrepresentations.

131.   Bank of America's failure to fulfill basic servicing functions of the loan, including determining the correct interest rates in effect, determining the correct monthly payment amounts, and accurately disclosing and applying periodic adjustments to the interest rate, payment amounts, and the remaining amounts of principal and interest owed, caused the Hunters damages.

132.   In November 2012, the Hunters began receiving communications from a new servicer, Specialized Loan Servicing ("SLS").

133.   Before servicing was transferred to SLS, Bank of America failed to respond to the Hunters' notice that the account was in error.

134.   Bank of America's failure to respond to the Hunters' notice of error violates 12 U.S.C. § 2605(e)(2).

135.   Bank of America's failure to take timely action to respond to the Hunters' request to correct errors violates 12 U.S.C. § 2605(k)(1)(C).

136.   Bank of America's failure to disclose that it did not intend to modify the loan prevented the Hunters from promptly seeking relief to remedy the alleged default.

137.   For instance, if Bank of America had disclosed that it did not intend to modify the loan the Hunters could have contacted a third party such as a professional housing counselor or an attorney.

138.   Bank of America did not correct its servicing and accounting errors before servicing transferred to SLS.

139.   Once SLS began servicing the property, the Hunters engaged support from a professional housing counselor at Parkview Services.

THIRD AMENDED COMPLAINT - 13

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

140.   Brian Carl, a housing counselor at Parkview, helped the Hunters prepare another application for a loan modification.

141.   The Hunters submitted all documents and information necessary for SLS to consider modifying the loan.

142.   After reviewing the Hunters' complete materials, SLS agreed to modify the payment terms on the Hunters' mortgage.

143.   But before an agreement could be executed, servicing was transferred to Nationstar Mortgage, LLC.

144.   Nationstar began servicing the property in April 2014.

145.   Nationstar did not resolve the servicing and accounting practices that had caused the loan to default and did not take steps to correct Bank of America's mistakes.

146.   Nationstar exacerbated the problem by continuing the practice of sending communications to the Hunters that falsely represented the terms of the loan.

147.   For instance, Nationstar, like Bank of America, falsely asserted that the loan was subject to an interest rate of 7.25 percent.

148.   Nationstar also adopted Bank of America's improper accounting of the loan, carrying forward an incorrect principal balance and interest owed and imposed excessive late fees and charges.

149.   Nationstar did not review the loan modification application and supporting materials the Hunters had submitted to SLS.

150.   Nationstar did not review the loan modification application and supporting materials the Hunters had submitted to SLS for any other form of loss mitigation.

151.   Nationstar did not notify the Hunters that it had (or had not) received any information relating to their application for a loan modification to SLS

THIRD AMENDED COMPLAINT - 14

152.   Nationstar did not tell the Hunters whether any information related to their loan modification application to SLS was complete or incomplete.

153.   Nationstar did not tell the Hunters whether any additional documents were required to render a loan modification application complete.

154.   Nationstar did not identify all necessary documents and information that may not have been transferred from SLS.

155.   Nationstar did not obtain all documents and information from SLS relating to the Hunters' application(s) for loss mitigation.

156.   Nationstar did not follow up with SLS regarding the loan modification application and supporting materials that were sent to SLS.

157.   At the time it began servicing the Hunters' loan, Nationstar had not adopted policies and procedures reasonably designed to ensure that it could identify necessary documents or information that may not have been transferred to it by SLS.

158.   At the time it began servicing the Hunters' loan, Nationstar had not implemented policies and procedures reasonably designed to ensure that it could identify necessary documents or information that may not have been transferred to it by SLS.

159.   These actions and omissions violated the Real Estate Settlement Procedure Act, 12 U.S.C. §§ 2601 *et seq.* and Regulation X, 12 C.F.R. §§ 1024.30-.41.

160.   The Hunters were compelled to start the loss mitigation process all over again.

161.   Nationstar required the Hunters to prepare and submit a new application for loss mitigation.

162.   Nationstar delayed processing the application.

163.   In January 2015, Nationstar threatened to foreclose on the property.

THIRD AMENDED COMPLAINT - 15

164. In preparation for foreclosure, Nationstar relied on an incorrect calculation of the amount owed by relying on interest rates that were higher than what was agreed to in the note.

165. For instance, Nationstar's calculations utilized an interest rate of 7.25 percent even though the note required Nationstar to use interest rates that were substantially less.

166. Under the terms of the note, the LIBOR index plus the margin resulted in an interest rate that would have been as low as 2.5 percent until February 2012, 3.125 percent in 2013, and 2.875 percent in 2014 and 2015.

167. Despite failing to exercise basic diligence in servicing the loan, Nationstar moved forward with foreclosure.

168. A month later, the foreclosure trustee, Quality Loan Servicing Corporation of Washington ("QLS"), began initiating foreclosure proceedings.

169. However, QLS was not appointed successor trustee until March or April of 2015.

170. In June 2015, QLS sent the Hunters a notice of default.

171. The notice relied on incorrect calculations regarding the amount owed for principal, interest, fees, and charges.

172. In July, QLS issued a notice of trustee's sale.

173. The notice relied on incorrect calculations regarding the amount owed for principal, interest, fees, and charges.

174. Reinstatement quotes created by Nationstar also reflect incorrect calculations, including an interest rate of 7.25 percent.  *See* Exhibit C attached hereto.

175. The monthly mortgage statements issued by Nationstar also reflected imposition of an incorrect interest rate.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

176.    In August, the Hunters and Nationstar participated in foreclosure mediation under Washington's Foreclosure Fairness Act ("FFA").

177.    The mediation was continued for several months due to Nationstar's demand for additional information and documentation.

178.    The mediation was set to occur in October but was continued because Nationstar demanded additional information and documentation.

179.    The mediation was scheduled for January 2016.

180.    The mediation was again continued by Nationstar because it claimed additional documentation was necessary.

181.    The mediation finally occurred in April 2016.

182.    HSBC did not participate substantively, if at all, in the mediation.

183.    The Hunters produced information establishing that they were eligible for a loan modification under federal guidelines.

184.    The Hunters produced information establishing that they were eligible for a loan modification under HSBC's loan modification guidelines.

185.    The Hunters included a net present value ("NPV") calculation supporting their application for a loan modification.

186.    Nationstar declined to modify the Hunters' loan.

187.    Instead, Nationstar demanded that the Hunters agree to double their monthly payment amounts from approximately $4,400 to approximately $9,000.

188.    Nationstar also demanded that the Hunters pay a lump sum "contribution" of $16,000.

189.    During the mediation, Nationstar did not provide the Hunters with accurate information regarding which loss mitigation options were available to them.

THIRD AMENDED COMPLAINT - 17

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

190.   Nationstar also relied on incorrect calculations of the amount owed, including an interest rate that was nearly double the interest rate in effect under the note.  *See* Exhibit D attached hereto.

191.   Nationstar also did not identify with specificity all loss mitigation options for which the Hunters were eligible.

192.   Nationstar did not properly evaluate the Hunters for all loss mitigation options that were available to them.

193.   For instance, Nationstar did not evaluate the loan modification application under each of HSBC's guidelines.

194.   This includes considering a 'Principal-Write-Down Modification' ("PWD").

195.   A PWD reduces payment by first writing-off principal (to mark-to-market LTV floor), then reducing interest rate (2% floor) and finally extending term (maximum 480 months).

196.   PWD program uses a 31% debt-to-income ratio based on gross income and the full mortgage payment including tax and insurance.

197.   Nationstar failed to evaluate a PWD modification as a loss mitigation solution for the Hunters.

198.   Nationstar failed to discuss all loss mitigation alternatives with HSBC, including but not limited to a PWD modification.

199.   HSBC failed to evaluate a PWD modification as a loss mitigation solution for the Hunters.

200.   Nationstar did not participate in the mediation in good faith as required under RCW 61.24.163.

201.   HSBC did not participate in the mediation in good faith as required under RCW 61.24.163.

THIRD AMENDED COMPLAINT - 18

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

202.   Under the Real Estate Settlement Procedure Act, Regulation X, and Consumer Finance Protection Bureau guidelines and interpretations, Nationstar was obligated to address and respond to the Hunters' servicing issues on behalf of the beneficiary.

203.   Nationstar failed to address and respond to servicing issues on behalf of the beneficiary.

204.   Bank of America and Nationstar maintained a pattern and practice of unreasonably delaying and denying loan modification applications.

205.   Nationstar maintained a pattern and practice of foreclosing on properties based on an incorrect accounting of amounts owed.

206.   Bank of America and Nationstar simultaneously and publicly represented compliance with the Real Estate Settlement Procedure Act and Regulation X but failed to ensure actual compliance with those policies.

207.   When QLS issued its notice of default and notices of trustee sale, documents identified HSBC Bank USA N.A. as Trustee for Merrill Lynch Mortgage Investors, Inc., Mortgage Pass-Through Certificates, MANA SERIES 2007-OAR2 ("HSBC") as the beneficiary.

208.   HSBC did not possess a hard copy of the original promissory note when it authorized QLS to issue its notice of trustee's sale on or about July 27, 2015.

209.   HSBC also did not possess a hard copy of the original promissory note when QLS issued a second notice of trustee's sale on or about June 16, 2016.

210.   This renders the foreclosure proceedings improper under the Deed of Trust Act.

211.   Nonetheless, a foreclosure sale on Mr. Hunter's property was set for October 14, 2016.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

212.   After the Hunters obtained counsel, Defendant QLS agreed to postpone the sale.

213.   The Hunters and Defendants Nationstar and HSBC then stipulated to entry of a preliminary injunction enjoining the sale subject to monthly payments of $3,226.72.  *See* Dkt. No. 15.

214.   The Court granted the parties' stipulated motion for a preliminary injunction on December 5, 2016.  *See* Dkt. No. 18.

215.   The order required the Hunters to make monthly payments into the Court's registry by the 7th of each month.  *Id.*

216.   Since entry of the Court's order, the Hunters have made timely payments into the Court's registry by the 7th of each month.

217.   On February 1, 2017, at the latest, the Hunters' loan should have been recast under the terms of the promissory note.

218.   Under the note, monthly payment amounts should have reflected an adjusted interest rate and payment that included both interest and principal.

219.   The Hunters' loan, however, was not recast.

220.   Nationstar simply continued its practice of sending the Hunters monthly mortgage statements based on the incorrect interest rate of 7.25 percent.  *See* Exhibit E attached hereto.

221.   Nationstar's monthly mortgage statements also demanded interest only payments.  *Id.*

222.   The explanation of amount due did not provide for principal payments.  *Id.*

223.   The explanation of amount due also included excessive and inaccurate amounts for fees, charges, escrow and allegedly overdue payments.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

224.    Bank of America, Nationstar, and HSBC failed to properly service the Hunters' loan under the terms of the note, loan documents, and governing state and federal law.

225.    The failure of these Defendants to properly service the Hunters' loan under the terms of the note, loan documents, and governing state and federal law, has prevented the Hunters from the opportunity of obtaining a loan modification or achieving any other solution that allows them to keep their home.

226.    The failure of these Defendants to properly service the Hunters' loan under the terms of the note, loan documents, and governing state and federal law has resulted in the reporting of false and inaccurate information to credit bureaus about the loan, including the applicable interest rate and amounts owed, further complicating their ability to obtain an alternative product on the market.

227.    The failure of these Defendants to properly service the Hunters' loan under the terms of the note, loan documents, and governing state and federal law has resulted in the reporting of false and inaccurate information to credit bureaus about the loan, including the applicable interest rate and amounts owed, further complicating their ability to obtain credit.

## V    CLAIMS AND CAUSES OF ACTION

### A.    Violations of the Consumer Protection Act

228.    The allegations set forth in paragraphs 1 through 227 are incorporated herein.

229.    The acts and practices of Bank of America as set forth in this complaint did not comply with the terms of the loan and federal regulations and guidelines governing the administration, servicing, and modification of Plaintiff's loan, including the Real Estate Settlement Procedure Act, 12 U.S.C. § 2605(e) and (k), and the Truth

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

in Lending Act, 15 U.S.C. §§ 1638(f), 1639(e), and 1639f and Regulation Z, 12 CFR §§ 1026.19, 1026.20, 1026.22, and 1026.41.

230.   The acts and practices of Bank of America as set forth in this complaint were unfair and deceptive under the Consumer Protection Act, Chapter 19.86 RCW.

231.   The acts and practices of Nationstar as set forth in this complaint did not comply with the terms of the loan and federal regulations and guidelines governing the administration, servicing, and modification of Plaintiff's loan, including regulations implementing the Real Estate Settlement Procedure Act and Regulation X, including 12 CFR 1024.17, 12 CFR § 1024.35, 12 CFR § 1024.38, and 12 CFR § 1024.41, as well as Consumer Finance Protection Bureau Bulletins 2013-01 dated February 11, 2013 and 2014-01 dated August 19, 2014 and the Truth in Lending Act, 15 U.S.C. §§ 1638(f), 1639(e), and 1639f and Regulation Z, 12 CFR §§ 1026.19, 1026.20, 1026.22, and 1026.41.

232.   Nationstar failed to participate in mediation under the Foreclosure Fairness Act in good faith as required under the Deed of Trust Act, RCW 61.24.163.

233.   A violation of the duty of good faith under the Deed of Trust Act constitutes a per se violation of the CPA.  *See* RCW 61.24.135(2).

234.   The acts and practices of Nationstar as set forth in this complaint were unfair and deceptive under the Consumer Protection Act, Chapter 19.86 RCW.

235.   Bank of America and Nationstar are agents of HSBC.

236.   HSBC is vicariously liable for the acts of Bank of America and Nationstar and resulting injuries and damages suffered by the Hunters.

237.   By failing to adequately oversee the servicing of the property as trustee and beneficiary consistent with the terms of the loan, Real Estate Settlement Procedure Act and Regulation X, including 12 CFR § 1024.17, 12 CFR § 1024.35, 12 CFR §1024.38, and 12 CFR §1024.41, as well as Consumer Finance Protection

THIRD AMENDED COMPLAINT - 22

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Bureau Bulletins 2013-01 dated February 11, 2013 and 2014-01 dated August 19, 2014, and the Truth in Lending Act, 15 U.S.C. §§ 1638(f), 1639(e), and 1639f and Regulation Z, 12 C.F.R. §§ 1026.19, 1026.20, 1026.22, and 1026.41, HSBC enabled and contributed to the unfair and deceptive acts of Bank of America and Nationstar.

238.   HSBC also did not possess the actual promissory note at the time the notice of default or notices of trustee sale were issued.

239.   HSBC was thus not the beneficiary pursuant to RCW 61.24.005(3).

240.   Initiating foreclosure proceedings against the Hunters was improper under the Deed of Trust Act.

241.   HSBC also failed to participate in mediation under the Foreclosure Fairness Act in good faith as required under the Deed of Trust Act, RCW 61.24.163.

242.   A violation of the duty of good faith under the Deed of Trust Act constitutes a per se violation of the CPA.  *See* RCW 61.24.135(2).

243.   The acts and practices of HSBC as set forth in this complaint were unfair and deceptive under the Consumer Protection Act, Chapter 19.86 RCW.

244.   Defendant QLS issued a notice of default on or about June 5, 2015.

245.   QLS issued a notice of trustee's sale on or about July 27, 2015.

246.   QLS issued a second notice of trustee's sale on or about June 16, 2016.

247.   QLS did not issue a new notice of default or otherwise conduct any diligence to confirm the accuracy of the content therein prior to issuing a notice of trustee's sale in 2016.

248.   QLS was not authorized to act as foreclosure trustee to the deed of trust of trust pursuant to the Deed of Trust Act, RCW 61.24.010 and RCW 61.24.040.

249.   QLS failed to conduct a cursory investigation and otherwise use its independent judgment before issuing foreclosure notices under the Deed of Trust Act.

250.   QLS violated the Deed of Trust Act.

THIRD AMENDED COMPLAINT - 23

251.   The acts and practices of QLS as set forth in this complaint were unfair and deceptive under the Consumer Protection Act, Chapter 19.86 RCW.

252.   The acts and practices of all Defendants occurred in the conduct of their trade or commerce because the acts and practices in question relate to the sale of property. *See* RCW 19.86.010(2).

253.   The acts and practices of all Defendants adversely impact the public interest and have injured Keith Hunter and Elaine Hunter and have the capacity to injure other persons.

254.   Defendants' acts and practices proximately caused injury to the Hunters, including, but not limited to the following:

a. The Defendants caused the Hunters to default on their loan.

b. The Defendants caused excessive interest, fees, fines, and charges to accumulate and compound on the Hunters' loan.

c. The Defendants prevented the Hunters from reducing the principal loan amount and growing equity in their home.

d. The Defendants prevented the Hunters from the opportunity of obtaining loss mitigation, including a reasonable loan modification.

e. The Defendants caused harm to the Hunters' credit rating.

f. The Defendants caused the Hunters to lose business income and profits.

g. The Defendants caused the Hunters to incur investigative costs and expenses including, but not limited to, investigative costs and expenses related to seeking injunctive relief to defend against a wrongful foreclosure sale.

h. The Defendants caused the Hunters to make monthly payments into the Court's registry to prevent Defendants from completing the wrongful foreclosure sale.

THIRD AMENDED COMPLAINT - 24

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

As a direct and proximate result of these Defendants' acts and practices, the Hunters have suffered injuries identified in paragraph 193 (a) through (h) and seek damages in an amount to be proved at the time of trial.

**B.    Breach of Contract**

255.    The allegations set forth in paragraphs 1 through 227 are incorporated herein.

256.    Plaintiff Elaine Hunter entered into a promissory note with Countrywide Bank, N.A.

257.    Plaintiff Keith Hunter is a third-party beneficiary under the contract.

258.    Countrywide Bank, N.A. assigned its rights and responsibilities under the note to Defendant HSBC and/or Defendant Bank of America.

259.    Defendants HSBC and Bank of America breached the terms of the promissory note by failing to adjust the interest rate and monthly payments on the note as required.

260.    Defendant Nationstar is an agent of HSBC.

261.    Defendant Nationstar breached the terms of the promissory note by failing to adjust the interest rate and monthly payments on the note as required.

262.    Plaintiffs were not aware of the breach until the fall of 2017 and the breach is continuing.

263.    Plaintiffs were not aware of any facts indicating that Defendants breached the terms of the promissory note until August 2012 at the earliest.

264.    Defendants' breach deprived Plaintiffs of the benefit of their bargain.

265.    As a proximate cause of Defendants' breach, the Hunters suffered damages.

**C.    Breach of the Implied Covenant of Good Faith and Fair Dealing**

THIRD AMENDED COMPLAINT - 25

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

266.   The allegations set forth in paragraphs 1 through 227 are incorporated herein.

267.   Plaintiff Elaine Hunter entered into a promissory note with Countrywide Bank, N.A.

268.   Plaintiff Keith Hunter is a third-party beneficiary under the contract.

269.   Countrywide Bank, N.A. assigned its rights and responsibilities under the note to Defendant HSBC and/or Defendant Bank of America.

270.   Defendants HSBC and Bank of America breached the terms of the promissory note.

271.   Defendants HSBC and Bank of America breached the implied covenant of good faith and fair dealing.

272.   Defendant Nationstar is an agent of HSBC.

273.   Defendant Nationstar breached the terms of the promissory note.

274.   Defendant Nationstar breached the implied covenant of good faith and fair dealing.

275.   Defendants' breach deprived Plaintiffs of the benefit of their bargain.

276.   As a proximate cause of Defendants' breach of the implied covenant of good faith and fair dealing, the Hunters suffered damages.

**D.     Intentional and/or Negligent Infliction of Emotional Distress**

277.   The allegations set forth in paragraphs 1 through 227 are incorporated herein.

278.   Defendants Nationstar and HSBC owed the Hunters quasi-fiduciary duties, common law duties, statutory, and regulatory duties pursuant to Chapters

THIRD AMENDED COMPLAINT - 26

61.24 RCW and 19.86 RCW and 12 U.S.C. §§ 2601 *et seq.* and Regulation X, 12 CFR §§ 1024.30-.41.

279.   As articulated more fully in the allegations set forth above, Nationstar committed unfair and deceptive acts and practices that prevented the Hunters from correcting the alleged default by promptly reviewing the completed loan modification application and supporting materials that had been submitted to SLS, and instead required the Hunters to start over again.

280.   Nationstar then unreasonably delayed a decision on the Hunters' application for two more years until ultimately denying the Hunters relief.

281.   Nationstar then initiated a wrongful foreclosure and agreed to postpone the sale only after the Hunters were able to obtain counsel.

282.   As articulated more fully in the allegations set forth above, HSBC committed unfair and deceptive acts and practices by failing to properly oversee the servicing of the Hunters' loan and facilitating, contributing to, and enabling Bank of America's actions and practices that caused the Hunters to default on their loan.

283.   HSBC then facilitated, contributed to, and enabled a disorderly, capricious, inconsistent, dilatory, and inattentive loss mitigation review process that has involved three separate servicers and endured for more than five years without resolution.

284.   Even after this litigation was commenced, and being apprised of internal servicing issues, HSBC and Nationstar continued making false statements in written communications to the Hunters about the terms and status of their loan.

285.   Even after this litigation was commenced and being notified of internal servicing issues, HSBC and Nationstar continued making false statements to third parties, including credit bureaus, about the terms and status of their loan.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

286.  The conduct of Nationstar and HSBC goes beyond all bounds of decency and is otherwise intolerable in a civilized society.

287.  As a direct and proximate cause of these Defendants' practices, the Hunters suffered injury and damages in an amount to be proven at trial.

## VI    DAMAGES

288.  Defendants' wrongful conduct described above has caused the Plaintiffs the following damages:

(a)  Damages to be established at the time of trial;

(b)  Treble damages pursuant to RCW 19.86.090; and

(c)  Out-of-pocket expenses, litigation costs, investigative costs, and attorney fees in amounts to be established at trial pursuant to RCW 19.86.090.

## VII    REQUEST FOR JUDGMENT AND EQUITABLE RELIEF

289.  Plaintiffs request that the court enter judgment against Defendant as follows:

(a)  An injunction precluding any foreclosure on the property until an independent accounting of the loan, including total amounts paid and accurate amounts owed under the terms of the note has been performed;

(b)  For the full benefit of the Hunters' bargain;

(c)  For the full amount of all damages that are established at trial;

(d)  For such damages to be trebled;

(e)  Litigation costs, investigative costs, and attorney's fees pursuant to RCW 19.86.090;

(f)  Pre-judgment and post-judgment interest;

(g)  A supplemental award to cover any adverse tax consequences of the judgment; and

THIRD AMENDED COMPLAINT - 28

1    290.    Such further equitable, legal or additional relief as may be appropriate

2  and just.

3         DATED: May 4, 2018.

4                                      BRESKIN JOHNSON & TOWNSEND, PLLC

5
                                       By:  s/Brendan W. Donckers
6                                          Brendan W. Donckers, WSBA #39406
                                           Daniel F. Johnson, WSBA #27848
7                                          1000 Second Avenue, Suite 3670
                                           Seattle, WA 98104
8                                          (206) 652-8660 Fax (206) 652-8290
                                           bdonckers@bjtlegal.com
9                                          djohnson@bjtlegal.com

10
                                       *Attorneys for Plaintiffs*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

THIRD AMENDED COMPLAINT - 29                    BRESKIN | JOHNSON | TOWNSEND PLLC
                                                1000 Second Avenue, Suite 3670
                                                Seattle, Washington 98104  Tel: 206-652-8660

1

## **CERTIFICATE OF SERVICE**

2

   I hereby certify that on this date I electronically filed the foregoing with the Clerk

3

of the Court using the CM/ECF system which will send notification of such filing to all

4

counsel of record.

5

   Dated May 4, 2018, at Seattle, Washington.

6

7
                                       */s/ Leslie Boston*_____
                                       Leslie Boston, Legal Assistant

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

THIRD AMENDED COMPLAINT - 30

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

EXHIBIT A

# PAYMENT ADVANTAGE
## FIXED/ADJUSTABLE RATE RIDER
### (LIBOR One Year Index - Rate Caps)

Redacted
[Doc ID #]

THIS FIXED/ADJUSTABLE RATE RIDER is made this TWENTY-SIXTH day of DECEMBER, 2006 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Payment Advantage Fixed/Adjustable Rate Note (the "Note") to Countrywide Bank, N.A.

("Lender") of the same date and covering the property described in the Security Instrument and located at:

7022 NE 170TH ST
KENMORE, WA 98028-3918
[Property Address]

**THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT THE ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME. FOR A LIMITED TIME THERE WILL BE A PAYMENT OPTION THAT IS LESS THAN THE FULL AMOUNT OF INTEREST DUE. IF THIS PAYMENT OPTION IS CHOSEN, THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED.**

**ADDITIONAL COVENANTS:** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST AND PAYMENTS
The Note provides for changes in the interest rate and the monthly payments, as follows:

• Payment Advantage Fixed/Adjustable Rate Rider One Year LIBOR – Multistate
1E680-XX (09/06)(d/i)                           Page 1 of 6



* 2 3 9 9 1 *

*   Redacted   0 0 0 0 0 1 E 6 8 0 *

DOC ID #:     Redacted

**2.   INTEREST**
    **(A)   Fixed Interest Rate**
    Interest will be charged on unpaid Principal until the full amount has been paid. Interest will initially accrue at a yearly rate of     7.250 %. This is my initial fixed interest rate and is the rate for determining the interest I owe until it changes as provided below. Interest will be charged on the basis of a twelve-month year and a thirty-day month.

    **(B)   Adjustable Interest Rate**
    The initial fixed interest rate I owe will change to an adjustable interest rate on the first     day of FEBRUARY, 2012     and the adjustable interest rate will change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date.

    **(C)   Index**
    Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal.* The most recent Index figure available as of the date 45 days before each Interest Rate Change Date is called the "Current Index."
    If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

    **(D)   Calculation of Adjustable Interest Rate Changes**
    Before each Interest Rate Change Date, the Note Holder will calculate my new adjustable interest rate by adding two and a quarter percentage point(s) 2.25 % (this amount is the "Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new adjustable interest rate until the next Interest Rate Change Date. My adjustable interest rate will never be greater than   12.250   % or lower than the Margin.

    **(E)   Limits on Interest Rate Changes**
    The interest rate in effect at the first Interest Rate Change Date will not be greater than 12.250   % or less than 2.25%. Thereafter, my adjustable interest rate will never be increased or decreased on any single Interest Rate Change Date by more than 2 percentage points from the rate of interest in effect for the preceding 12 months.

**3.   PAYMENTS**
    **(A)   Time and Place of Payments**
    I will make a payment every month.

BANA_00024

DOC ID #:        Redacted

I will make my monthly payments on the  FIRST        day of each month beginning on MARCH 01, 2007          . I will make these payments every month until I have paid all the Principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If I still owe amounts under this Note on   FEBRUARY 01, 2037   , I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
P.O. Box 10219, Van Nuys, CA 91410-0219
or at a different place if required by the Note Holder.

**(B)   Minimum Payment**

The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment. The Minimum Payment is calculated three (3) different ways during the loan term:

(i)    Until   FEBRUARY 01, 2017      ("Recast Date") or until the Maximum Negative Amortization Cap is reached, whichever is earlier, the Minimum Payment will be calculated using the then-current interest rate (either fixed or adjustable as described in Section 2) minus     5.000 percentage points. The result of this calculation is called the "Minimum Payment Rate." The Minimum Payment Rate can never be lower than 1%. Since the Minimum Payment Rate is less than the interest rate applied to my unpaid Principal balance, the Minimum Payment will be insufficient to pay the interest portion of the monthly payment and no portion is applied to Principal. **When I make a Minimum Payment, which is based on the Minimum Payment Rate that is less than the rate of interest due, the unpaid interest is added to the Principal amount. This is known as "deferred interest" or "negative amortization."**

(ii)   If the unpaid Principal balance reaches the Maximum Negative Amortization Cap prior to the Recast Date, my new Minimum Payment will be the amount that would pay only the interest portion of the monthly payment based upon the then-current interest rate, which changes in accordance with Section 2. This is the Minimum Payment in effect until the Recast Date.

(iii)  After the Recast Date and for the remainder of the loan term, the Minimum Payment will be the monthly payment amount necessary to pay the loan off, in full, at the Maturity Date in substantially equal payments based on the then-current interest rate, which changes in accordance with Section 2.

**(C)   Initial Monthly Minimum Payment**

Each of my initial monthly Minimum Payments until the first Interest Rate Change Date will be in the amount of U.S. $ 3,822.46         .

**(D)   Monthly Payment Changes**

Changes in my monthly payment will be the result of changes in the unpaid Principal balance of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Sections 2 and 3 of this Note.

BANA_00025

DOC ID #:     Redacted

**(E)  Additions to My Unpaid Principal**

For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest due and will add the difference to my unpaid Principal. Interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest due, the Note Holder will apply the payment as provided in Section 3(A).

**(F)  Payment Options**

Until the Recast Date, the Note Holder may provide me with up to three (3) additional monthly payment options ("Payment Options") if they are **greater** than the Minimum Payment. The Payment Options are calculated using the interest rate in accordance with Section 2. The following Payment Options may be provided:

(i)   **Interest Only Payment:** the amount that would pay only the interest portion of the monthly payment. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii)   **Amortized Payment:** the amount necessary to pay the loan off (Principal and interest) at the Maturity Date in substantially equal payments based on the then-current interest rate.

(iii)  **15 Year Amortized Payment:** the amount necessary to pay the loan off (Principal and interest) within a fifteen (15) year term from the first payment due date in substantially equal payments at the then-current interest rate.

These Payment Options are only available if they are **greater** than the Minimum Payment. If the Maximum Negative Amortization Cap is reached, then the Payment Options available will be the Amortized Payment and the 15 Year Amortized Payment. Upon the Recast Date I will no longer have Payment Options and I will be required to pay the Amortized Payment, which becomes the Minimum Payment as described in Section 3(B)(iii).

**B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument entitled "Transfer of the Property or a Beneficial Interest in Borrower" is amended to read as follows:

(A)   Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 2 above, Paragraph 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by

DOC ID #:      Redacted

this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

     If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

     **(B)**   When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 2 above, Paragraph 18 of the Security Instrument described in Section 12(A) above shall then cease to be in effect, and Paragraph 18 of the Security Instrument shall instead read as follows:

     **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

     If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender. To the extent permitted by Applicable Law, Lender may charge reasonable fees as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

     If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this

BANA_00027

DOC ID #:      Redacted

Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Payment Advantage Fixed/Adjustable Rate Rider.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

*Elaine A. Hunter* _____
ELAINE A. HUNTER                                    -Borrower

*Donald J. Hunter* _____
DONALD J. HUNTER                                    -Borrower

_____
                                    -Borrower

_____
                                    -Borrower

• Payment Advantage Fixed/Adjustable Rate Rider One Year LIBOR -- Multistate
1E680-XX (09/06)                      Page 6 of 6

BANA_00028

EXHIBIT B

C3_4098 PREFCL.14 15116 08/09/2012


Bank of America
Home Loans

P. O. Box 940335
Simi Valley, CA 93094-0335

**Notice Date:**     October 31, 2012

MORTGAGOR(s): ELAINE HUNTER
8215 42ND AVE NE
SEATTLE, WA 98115-5105

**Account No.:**    Redacted

**Property Address:**
7022 NE 170th St
Kenmore, WA 98028

Dear ELAINE HUNTER:

You are receiving this notice because your mortgage is in default, and your property will be referred to foreclosure. Bank of America, N.A. is required to notify you of the following:

1. **Standing:**

Bank of America, N.A. services the mortgage loan on your property located at the address referenced above. You signed and executed a promissory note secured by a mortgage or deed of trust ("the security instrument") in which you agreed to repay your debt at agreed upon terms. Because you have not fulfilled the terms of this agreement, Bank of America, N.A. intends to initiate foreclosure action on the mortgaged property. The foreclosure will be conducted in the name of: HSBC BANK USA, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE HOLDERS OF MERRILL LYNCH MORTGAGE INVESTORS, INC., MORTGAGE PASS-THROUGH    CERTIFICATES, MANA SERIES 2007-OAR2 ("Noteholder").

Noteholder, directly or through an agent, has possession of the promissory note. The promissory note is either made payable to Noteholder or has been duly endorsed. WHERE REQUIRED BY APPLICABLE LAW: Noteholder is the original mortgagee or beneficiary or the assignee of the security instrument for the referenced loan.

2. **Account Status as of October 30, 2012:**

   A. The total amount needed to reinstate or to bring the account current is $69,299.31. Please note this amount is subject to change. Please call us for the most current amount.

   B. The amount of the principal obligation under the mortgage is $1,147,279.62.

   C. The date through which the account is paid is October 1, 2011.

   D. The date of the last full payment was November 22, 2011.

   E. The current interest rate in effect for the loan is 7.250.

   F. The date on which the interest rate may next reset or adjust is February 1, 2013.

   G. The amount of any prepayment fee (not included in the reinstatement amount) to be charged if any is Not Applicable.

   H. The amount of late payment fees and other charges included in the above reinstatement amount is $1,129.71.

This communication is from Bank of America, N.A., the servicer of your home loan.

EXHIBIT C

4/10/2015

# Nationstar
### MORTGAGE

## Reinstatement Quote
Generated Friday April 10 2015

### Loan Demographics

| | | | | |
|---|---|---|---|---|
| Account Number | | Reinstatement Good Through | 4/30/2015 | Property Address |
| | | Mailing Address | | REDMOND WA 98052 |

### First Borrower

### Second Borrower

### Schedule of Payments

| Contractual Payment Date | Last Payment Date | Principal & Interest | Escrow | Total Payment | Funds at the time | Balance | Total |
|---|---|---|---|---|---|---|---|

Nationstar Mortgage
Default Referral
350 Highland Drive
Lewisville, Texas 75067

Page 1 of 2

QLSWA 189

4/10/2015


**Nationstar** MORTGAGE

## Reinstatement Quote

### Corporate Advances

| Description | Advance Date | Amount | Description | Advance Date | Amount |
|---|---|---|---|---|---|
| TOTAL PREVIOUS SERVICER ADVANCE | 11/8/2013 | $ 33.00 | | | |
| OCAPRAISAL | 12/13/2013 | $ 115.00 | | | |
| ORDER-Title Report-His | 10/31/2014 | $ 345.00 | | | |
| OCAPRAising Insp | 3/27/2015 | $ 39.50 | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | Balance of Corial Escrow Lock Column | | $ | 532.50 |
| | | | | $ | 532.50 |

### Escrow Advances

| Reinstatement Date | Check No | From Date | Description | Post Date | Total Amount |
|---|---|---|---|---|---|
| 29 | | 4/24/2014 | 4/24/2014 ESCROW ADVANCE | 11/12/2011 | 41,618.73 |
| 29 | 30 | 8/25/2014 | 8/25/2014 HAZ/HAZ COST/CASUALS OF FLOOD \$ | 11/12/2011 | 3,447.00 |
| 29 | 31 | 8/27/2014 | 8/27/2014 COUNTY TAX ADVANCE | 11/12/2011 | 6,027.28 |

Nationstar Mortgage
Default Referral
350 Highland Drive
Lewisville, Texas 75067

Page 2 of 2

QLSWA 200

6/30/2015



### Reinstatement Quote

Loan Description

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | |

**Schedule of Payments**

First Borrower

Second Borrower

Nationstar Mortgage
Default Referral
350 Highland Drive
Lewisville, Texas 75067

Page 1 of 3

QLSWA 305



6/30/2015

## Reinstatement Quote

### Corporate Advances

| Description | Advance Date | Amount | Description | Advance Date | Amount |
|---|---|---|---|---|---|
| CIVIL PREVIOUS SERVICER ADVANCE | 11/5/2015 | $0.00 | | | |
| OCFA-BPO | 10/15/2015 | 110.50 | | | |
| OCFA-Drive By Inspection | 10/30/2015 | 140.00 | | | |
| OCFA-By Drive By Costs | 4/14/2015 | 20.00 | | | |
| OCFA-Prop Insp | 4/30/2015 | 110.50 | | | |

### Escrow Advances

| | | Paid Date | Description | | Paid Date | Amount |
|---|---|---|---|---|---|---|
| 19 | | 4/14/2015 | 4/14/2015 BAP/WI ADVANCE | 11/15/2015 | $1,915.73 |
| 19 | 53 | 4/30/2015 | 4/24/2015 PREPAID/ARM/PAIDAO/NEIGHBORHOOD | 11/15/2015 | 3,447.60 |
| 19 | 31 | 4/30/2015 | 4/30/2015 COUNTY TAX ADVANCE | 11/15/2015 | 6,027.38 |
| 19 | 31 | 4/30/2015 | 4/30/2015 COUNTY TAX ADVANCE | 11/15/2015 | 3,217.61 |
| 33 | 53 | 5/24/2015 | 5/24/2015 PREPAID/ARM/PAIDAO/NEIGHBORHOOD | 11/15/2015 | 3,546.00 |

| Paid Date | Effective Date | Description | Escrow Amount |
|---|---|---|---|
| 04/24/2016 | 04/24/2016 | PAID BPO ADVANCE | 3,546.00 |
| 04/30/2015 | 04/30/2015 | COUNTY TAX ADVANCE | 2,217.61 |
| 04/30/2016 | 04/30/2016 | COUNTY TAX ADVANCE | 6,027.38 |
| 04/30/2016 | 04/30/2016 | PAID PROOF ADVANCE | 2,447.60 |
| 04/24/2016 | 04/24/2016 | ESCROW ADJUSTMENT | 41,915.73 |
| 04/24/2016 | 04/24/2016 | ESCROW ADVANCE | 41,915.73 |

| Description | Amount | Tran Date |
|---|---|---|
| OCFA-Prop Insp | 15.00- | 01/14/2015 |
| OCFA-Prop Insp | 15.00- | 01/14/2015 |
| OCFA-Parking Costs | 20.00- | 01/24/2015 |
| OCFA-Prop Insp | 15.00- | 04/13/2015 |
| OCFA-Prop Insp | 15.00- | 12/01/2015 |
| OCFA-Prop Insp | 30.00 | 02/20/2015 |
| OCFA-Prop Insp | 15.00- | 02/20/2015 |
| OCFA-Prop Insp | 15.00- | 01/14/2015 |
| OCFA-Prop Insp | 15.00- | 03/03/2015 |
| OCFA-Prop Insp | 15.00- | 11/21/2016 |
| OCFA-Prop Insp | 15.00- | 10/15/2016 |
| OCFA-Title Inspection | 140.00- | 10/30/2016 |
| OCFA-Prop Insp | 15.00- | 12/03/2016 |
| OCFA-Prop Insp | 15.00- | 03/30/2016 |
| OCFA-Prop Insp | 15.00 | 04/20/2016 |
| OCFA-Prop Insp | 15.00- | 04/30/2016 |
| OCFA-Prop Insp | 51.35- | 05/01/2016 |
| OCFA-Prop Insp | 15.00- | 07/10/2016 |
| OCFA-Prop Insp | 15.00- | 07/13/2016 |
| OCFA-Prop Insp | 15.00- | 01/13/2016 |
| OCFA-Prop Insp | 15.00- | 05/20/2016 |
| OCFA-Prop Insp | 31.35- | 04/04/2016 |
| OCFA-Prop Insp | 31.35- | 05/25/2016 |
| OCFA-Prop Insp | 31.35- | 04/20/2016 |
| OCFA-Prop Insp | 31.35- | 04/14/2016 |
| OCFA-Prop Insp | 31.35- | 04/24/2016 |
| CIVIL PREVIOUS SERVICER | 90.00- | 04/24/2016 |

Nationstar Mortgage
Default Referral
350 Highland Drive
Lewisville, Texas 75067

*Page 2 of 3*

QLSWA 306

6/30/2015



| | | Reinstatement Quote |
|---|---|---|
| | | General Fund pays in full |
| COMA Prop Insp | 11.85- | 04/16/2014 |
| COMA BPO | 110.00- | 04/21/2014 |
| COMA Prop Insp | 11.35- | 04/18/2014 |
| COMA Prop Insp | 11.85- | 04/15/2014 |
| COMA Prop Insp | 11.85- | 04/06/2014 |

Nationstar Mortgage
Default Referral
350 Highland Drive
Lewisville, Texas 75067

Page 3 of 3

QLSWA 307

EXHIBIT D

NPV Data Model

QLSWA 412

http://npv/NPVModel/ModelResults.aspx

4/13/2016

EXHIBIT E

**mr. cooper**™
CHANGING THE FACE OF HOME LOANS
8950 Cypress Waters Blvd.
Dallas, TX 75019

## MORTGAGE LOAN STATEMENT

| | |
|---|---|
| STATEMENT DATE | PAYMENT DUE DATE |
| 12/19/2017 | 01/01/2018 |
| LOAN NUMBER | **REINSTATEMENT** |
| 0618626790 | **AMOUNT DUE\*** |
| PROPERTY ADDRESS | **$404,629.12** |
| 7022 NE 170TH ST | *If payment is received on or* |
| KENMORE, WA 98028 | *after 01/17/2018, a $0.00 late fee will be charged.* |

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
0012762 02 MB   0.420 02   TR 00061 RNRGE9J3 100000

ELAINE A HUNTER
DONALD J HUNTER
C/O BRESKIN JOHNSON & TOWNSEND, PLLC
1000 SECOND AVENUE, SUITE 3670
SEATTLE WA 98104

### QUESTIONS? WE'RE HERE TO HELP.

CUSTOMER SERVICE **888-480-2432**
Mon-Thu 7 a.m. to 8 p.m. (CT)
Fri 7 a.m. to 6 p.m. (CT)
Sat 8 a.m. to 2 p.m. (CT)
www.mrcooper.com

YOUR Dedicated Loan Specialist is
Tina Mapps
AND CAN BE REACHED AT:
(866) 316-2432 EXT. 6862378
or via mail at:
8950 Cypress Waters Blvd
Dallas, TX 75019

## EXPLANATION OF AMOUNT DUE

| CATEGORY | |
|---|---|
| PRINCIPAL | $0.00 |
| INTEREST | $6,931.48 |
| ESCROW AMOUNT (FOR TAXES & INSURANCE) | $1,237.67 |
| OPTIONAL PRODUCTS / SERVICES | $0.00 |
| TOTAL FEES & CHARGES | $412.29 |
| OVERDUE PAYMENT(S) | $387,914.15 |
| LENDER PAID EXPENSES* | $8,133.53 |
| PARTIAL PAYMENT (UNAPPLIED) | $0.00 |
| **REINSTATEMENT AMOUNT DUE\*** | **$404,629.12** |
| ACCELERATION AMOUNT DUE | $1,503,015.01 |

*Excludes Lender Advances for future Interest costs.

### ACCOUNT OVERVIEW

| | |
|---|---|
| INTEREST BEARING PRINCIPAL BALANCE | INTEREST RATE |
| $1,147,279.62 | 7.250% |
| | as of 12/19/2017 |
| | ESCROW BALANCE |
| | -$87,770.65 |

The Principal Balance does not represent the payoff amount of your account and is not to be used for payoff purposes.

### PAST PAYMENTS BREAKDOWN

| CATEGORY | PAID SINCE 11/21/2017 | PAID YEAR TO DATE |
|---|---|---|
| PRINCIPAL | $0.00 | $0.00 |
| INTEREST | $0.00 | $0.00 |
| ESCROW (TAXES & INSURANCE) | $0.00 | $0.00 |
| OPTIONAL INSURANCE | $0.00 | $0.00 |
| FEES & CHARGES | $0.00 | $0.00 |
| LENDER PAID EXPENSES | $0.00 | $0.00 |
| PARTIAL PAYMENT (UNAPPLIED) | $0.00 | $0.00 |
| **TOTAL** | **$0.00** | **$0.00** |

See page 2 for detailed Lender Paid Expenses Summary

## HERE'S SOME HELPFUL INFORMATION (See Page 2 for Additional Critical Notices)

*The Reinstatement Amount Due is the amount you must pay as of the date of this billing statement to bring your loan current. Your loan has been accelerated. The Acceleration Amount Due is the approximate payoff as of the date of this billing statement. Neither of these amounts include fees and costs incurred but not yet billed. Please call us to request a reinstatement quote or payoff quote as these amounts will change frequently. We require all reinstatement payments to be made in certified funds through either a cashier's check or money order, made payable and mailed to Nationstar Mortgage LLC d/b/a Mr. Cooper.

As shown above, your escrow account has a negative balance. This shortage in your escrow account may result in an increase in your monthly escrow payment. We recommend you make additional payments to your escrow to eliminate or reduce the shortage.

## TRANSACTION ACTIVITY (11/21/2017 to 12/19/2017)

| DATE | DESCRIPTION | TOTAL | PRINCIPAL | INTEREST | ESCROW | OTHER |
|---|---|---|---|---|---|---|
| 12/14/2017 | Property Inspections | -$15.00 | | | | -$15.00 |
| 11/21/2017 | Property Inspections | -$15.00 | | | | -$15.00 |

Mr. Cooper is simply a new brand name for Nationstar Mortgage LLC. Nationstar Mortgage LLC is doing business as Nationstar Mortgage LLC d/b/a Mr. Cooper. Mr. Cooper is a registered trademark of Nationstar Mortgage LLC. All rights reserved.

Nationstar Mortgage LLC d/b/a Mr. Cooper is a debt collector. This is an attempt to collect a debt and any information obtained will be used for that purpose. However, if you are currently in bankruptcy or have received a discharge in bankruptcy, this communication is not an attempt to collect a debt from you personally to the extent that it is included in your bankruptcy or has been discharged, but is provided for informational purposes only.

✂- - - - - - - - - - - DETACH HERE AND RETURN WITH YOUR PAYMENT, PLEASE ALLOW 7 DAYS FOR MAIL DELIVERY - - - - - - - - - - - -

**mr. cooper**™
CHANGING THE FACE OF HOME LOANS   www.mrcooper.com

| ACCOUNT NUMBER | REINSTATEMENT AMOUNT DUE\* | |
|---|---|---|
| 0618626790 | 01/01/2018 | $404,629.12 |

☐ PLEASE CHECK BOX IF MAILING ADDRESS OR
PHONE NUMBER HAS CHANGED. ENTER
CHANGES ON BACK OF COUPON

ELAINE A HUNTER
DONALD J HUNTER

| WRITE YOUR LOAN NUMBER ON YOUR CHECK OR MONEY ORDER AND MAKE PAYABLE TO MR. COOPER™ | PAYMENT DUE IF RECEIVED ON OR AFTER | |
|---|---|---|
| | 01/17/2018 | $404,629.12 |

MR. COOPER
PO BOX 650783
DALLAS, TX 75265-0783
‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖

| ADDITIONAL ESCROW | $ |
|---|---|
| **ADDITIONAL PRINCIPAL | $ |
| TOTAL AMOUNT OF YOUR CHECK | |
| DO NOT SEND CASH | |

**Also returned in the period after loan billing cycle may include amounts not yet due.

0618626790 0 040462912  040462912

**IMPORTANT PAYMENT INFORMATION**

**SERVICEMEMBERS CIVIL RELIEF ACT**

**LATE CHARGES AND OVERDRAFT FEES**

**HOMEOWNER COUNSELING NOTICE**

**NEW YORK STATE RESIDENTS**

## PAYMENT OPTIONS

**AUTOPAY**

**ONLINE PAYMENT**

**AUTOMATED PHONE PAYMENT**

**AGENT ASSISTED PAYMENT**

**PAY BY MAIL**

**WIRE**

**MONEYGRAM EXPRESSPAYMENT**

**WESTERN UNION QUICKCOLLECT**

### NOTICE TO CUSTOMERS MAKING PAYMENTS BY CHECK

## CONTACT INFORMATION

**CUSTOMER SERVICE:** 888-480-2432

**24-HOUR AUTOMATED ACCOUNT INFORMATION:** 888-480-2432.

**MAILING ADDRESSES:**

| PAYMENTS: | NOTICE OF ERROR/ INFORMATION REQUEST/QWR*: | OVERNIGHT DELIVERY CORRESPONDENCE: | INSURANCE RENEWALS/ BILLS: | TAX NOTICES/ BILLS: | BANKRUPTCY NOTICES/ PAYMENTS: |
|---|---|---|---|---|---|

## CHANGE OF ADDRESS OR TELEPHONE NUMBER


mr.
**cooper**™
CHANGING THE FACE OF HOME LOANS

## MORTGAGE LOAN STATEMENT

STATEMENT DATE
**12/19/2017**

PAYMENT DUE DATE
**01/01/2018**

LOAN NUMBER
**0618626790**

**REINSTATEMENT
AMOUNT DUE***

PROPERTY ADDRESS

**$404,629.12**

7022 NE 170TH ST
KENMORE, WA 98028

*If payment is received on or
after 01/17/2018, a $0.00
late fee will be charged.*

### LENDER PAID EXPENSES

|  | LAST STATEMENT | TOTAL |
|---|---|---|
| PROPERTY INSPECTIONS (12/11/2017) | $30.00 | $776.00 |
| PRIOR SERVICER ADVANCES | $0.00 | $90.00 |
| ESCROW ADVANCES | $0.00 | $16,834.81 |
| LEGAL FEES | $0.00 | $7,267.53 |
| **TOTAL** | **$30.00** | **$24,968.34** |

### QUESTIONS? WE'RE HERE TO HELP.

CUSTOMER SERVICE: 888-480-2432
Mon to 7 a.m. to 8 p.m. (CT)
Fri 7 a.m. to 6 p.m. (CT)
Sat 8 a.m. to 2 p.m. (CT)
www.mrcooper.com

YOUR Dedicated Loan Specialist is
Tina Mapps
AND CAN BE REACHED AT
(856) 316-2432 EXT. 6862378
or via email at:
8950 Cypress Waters Blvd
Dallas, TX 75019

## HERE'S SOME HELPFUL INFORMATION

Lender Paid Expenses are funds paid by Mr. Cooper on your behalf to another company. These expenses may include, but are not limited to, Legal Fees, Property Taxes, Homeowners Insurance, and Property Inspections.

"Total Fees & Charges" include, but are not limited to, phone pay fees, insufficient fund fees, or convenience fees. These fees & charges appear in the "Other" category of the Transaction Detail, if applied since the last billing cycle.

If you do not wish to receive paper statements, simply log into your account at www.mrcooper.com and alter your selection to eCorrespondence. ECorrespondence offers convenient monthly email reminders, no lost mail, and archived online access to view or download to your personal computer.

You can make your payment online at www.mrcooper.com. There is no charge for this service.

0001276Z RNRGE8A20 018781