HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KEITH HUNTER, an individual, and
ELAINE HUNTER, an individual

                    Plaintiffs,

        v.

BANK OF AMERICA, N.A., et al.,

                    Defendants.

No. 2:16-cv-01718-RAJ

ORDER

## I.      INTRODUCTION

There are four motions before the Court.[1]  Plaintiffs Elaine and Keith Hunter ("Plaintiffs") filed a motion for partial summary judgment against Defendants Bank of America, N.A. ("BANA"), Nationstar Mortgage LLC ("Nationstar"), and HSBC Bank USA N.A. as Trustee for Merrill Lynch Mortgage Investors, Inc., Mortgage Pass-Through Certificates, MANA Serious 2007-OAR2 ("HSBC").  Dkt. # 76.  BANA, Nationstar, and HSBC each responded and filed a cross-motion for summary judgment. Dkt. ## 89-91, 93.  Having reviewed the briefing, the record, and relevant case law, the

---

[1] As an initial matter, the Court notes that there appears to be some dispute about whether the parties properly met and conferred prior to the filing of all pending motions.  *See* Dkt. # 91 at 6; Dkt. # 102 at 3.  This is unacceptable.  The meet and confer requirement is clearly articulated in the Court's standing order.  *See* Dkt. # 13 at 3.  It is a requirement, not a suggestion.  Although the Court declines to strike the parties' motions on this basis, the Court will not hesitate to do so in the future.

ORDER – 1

Court finds that oral argument is unnecessary to the resolution of the matters at issue.

## II.      BACKGROUND

In March 1996, Plaintiff Elaine Hunter, now in her nineties, and her now deceased husband Donald Hunter purchased the property at 7022 NE 170th Street in Kenmore, Washington ("the property").  Dkt. # 51 ¶¶ 1, 10-11.  Their son, Plaintiff Keith Hunter, began to live on the property soon after it was purchased.  *Id.* ¶ 13.  In December 2006, Donald and Elaine Hunter obtained a residential mortgage loan ("the loan") in the amount of $1,000,000 and executed a promissory note ("the Note") with Countrywide Bank, N.A.  Dkt. # 76 at 7; Dkt. # 89 at 3.  The Note was secured by a deed of trust over the property ("Deed of Trust"), recorded on January 10, 2007, in King County, Washington, as instrument number 20070110000985.  Dkt. # 89 at 3.

According to the Note, interest accrued at an initial fixed yearly rate of 7.25 percent until February 1, 2012.  Dkt. # 92-2 at 2.  On that date, the initial fixed interest rate changed to an adjustable interest rate, which would change every year thereafter on that day based on the LIBOR Index.  *Id.*  Before each interest rate change date, the Note holder would calculate the new adjustable interest rate by adding 2.25 percentage points to the current Index.  *Id.*  The adjustable interest rate would never be greater than 12.25 percent or lower than 2.25 percent.  *Id.*

The initial monthly minimum payment until the first interest rate change date was $3,822.46.  *Id.*  Because the minimum monthly payment rate was less than the interest rate, the unpaid interest was added to the principal, thereby increasing the balance.  *Id.*  The Note set a limit on the maximum unpaid balance, or Maximum Negative Amortization Cap, at 115 percent of the principal amount of $1,000,000.  *Id.* at 2.  If the negative amortization cap was reached (that is, the unpaid balance reached $1,150,000), before February 1, 2017, then the new minimum payment would be only the interest portion of the monthly payment.  *Id.* at 3.  After February 1, 2017, the "Recast Date," and for the remainder of the loan term, the minimum payment would be the monthly amount

ORDER – 2

necessary to pay the loan off in full at the maturity date in substantially equal payments based on the then-current interest rate.  *Id.*  With respect to any changes to the minimum payment, the Note holder had to provide "notice of any changes in the amount of . . . monthly payment before the effective date of any change."  *Id.* at 4.  Such notice had to include information required by law as well as "the title and telephone number of a person who will answer any question [the borrower] may have regarding the notice."  *Id.* at 4.

In 2007, the loan was bundled with other mortgages, converted to a mortgage-backed security, and sold to a trust overseen by HSBC.  Dkt. # 76 at 8.  BANA began servicing the loan after it acquired Countrywide in 2007.  Dkt. # 89 at 3.  BANA sent monthly mortgage statements to Elaine and Donald Hunter, and they routinely made minimum monthly payments.  *Id.* at 4.

On August 15, 2011, BANA sent a letter to Ms. Hunter, notifying her that the "interest rate is scheduled for an adjustment" on February 1, 2012.  Dkt. # 92-4 at 2.  The letter stated that the "New Interest Rate" was 7.25 percent and the "Anticipated Principal Balance" was $1,147,279.63.  *Id.*  The "New Principal and/or Interest payment" was $6,931.48, and this new payment was effective on November 1, 2011.  *Id.*  The letter stated that changes in the interest rate were "based on the NA," which was an undefined term.  *Id.*  The letter provided a phone number for Customer Service Representatives as well as a number to contact "dedicated Loan Consultants" if Ms. Hunter had concerns about her ability to make the new payments.  *Id.* at 3.

On November 14, 2011, Ms. Hunter tried to make a payment of $9,491.70 via credit card for the months of October and November.  Dkt. # 90 at 5.  The next day, she was informed that credit card payments are not accepted and that the amount necessary to bring the loan current was $10,120.26, based on a monthly payment of $5,060.13 for October 2011 and the same amount for November.  *Id.* at 5; Dkt. # 92-7 at 2.  A week later, Ms. Hunter made a payment of $5,060.13, and the following week, she made a

ORDER – 3

second payment of $5,060.13.  Dkt. # 90 at 5.  Both payments were reversed by BANA as "insufficient" to bring the loan current.  *Id.*

On December 19, 2011, BANA sent Ms. Hunter a Notice of Intent to Accelerate, notifying her that $16,684.87 was due and that she was in default.  *Id.*  Plaintiffs continued to make monthly payments, from December 2011 onwards, all of which BANA reversed as insufficient to bring the loan current.  *Id.*  On March 9, 2012, BANA sent Ms. Hunter a letter informing her that she owed payments for five months, at a rate of $5,060.13 each month.  Dkt. # 77-3 at 27.

Beginning in December 2011, Plaintiffs sought to obtain a loan modification.  Dkt. # 90 at 7.  Between January 2012 through September 2012, BANA discussed a potential loan modification with Plaintiffs.  *Id.*  Plaintiff spoke with BANA representative Paul D. Mills about the documents necessary for their loan modification application and met with him several times to discuss the modification.  Dkt. # 76 at 11.

On June 2, 2012, Ms. Hunter received a letter notifying her that she met the criteria to apply for a new modification program announced as a result of the U.S. Department of Justice and State Attorneys General global settlement with major servicers, including BANA.  Dkt. # 77-3 at 29.  On June 21, 2012, she received a second letter again encouraging her to contact a BANA home loan specialist to apply for this loan modification program.  *Id.* at 31.  Plaintiffs continued to meet with Mr. Mills over the summer of 2012 and submitted additional documents for the loan modification application.  Dkt. # 76 at 12; Dkt. # 90 at 7.  Several weeks later, Mr. Mills informed Keith Hunter that BANA had "sold the note" and that he was no longer able to assist with the loan modification application.  Dkt. # 76 at 12.  In October 2012, BANA sent the Hunters a notice stating that their loan would be referred to foreclosure.  *Id.* at 13.

On November 1, 2012, the loan was transferred from BANA to Specialized Loan Servicing ("SLS").  Dkt. # 92 ¶ 43.  A month later, SLS sent the Ms. Hunter a Notice of Default, asserting that she failed to pay the November 2011 mortgage payment.  *Id.*  The

ORDER – 4

Hunters contacted and obtained assistance from housing counselors at Parkview Services in the application of a loan modification with SLS.  Dkt. # 76 at 13.  Just before SLS finalized the loan modification, SLS transferred loan servicing responsibility to Nationstar.  *Id.* at 14.

On April 1, 2014, Nationstar began servicing the mortgage.  *Id.*  The amount due on the loan at that time was $140,843.36.  Dkt. # 91 at 9.  In June 2014, Nationstar sent Ms. Hunter a letter stating that it was unable to offer her a loan modification.  Dkt. # 91 at 10.  Nationstar indicated that she had been evaluated for several "Loss Mitigation Options" but had been denied.  Dkt. # 77-5 at 40.  Specifically, the letter indicated that Ms. Hunter was denied three programs: (1) HAMP Tier 1 was denied due to an ineligible mortgage; (2) HAMP Tier II was not available; and (3) Standard Modification was denied because of missing documents.  *Id.*

In 2015, Nationstar began nonjudicial foreclosure proceedings.  Dkt. # 76 at 15; Dkt. # 91 at 11.  Nationstar participated in three separate mediation sessions with Ms. Hunter on January 11, 2016, March 28, 2016, and April 20, 2016.  Dkt. # 91 at 11.  Nationstar participated in the foreclosure mediation "on behalf of HSBC as its attorney in fact."  *Id.*  Nationstar stated that it performed a Net Present Value test ("NPV") in advance of the mediation sessions to determine whether the loan was eligible for a loan modification review.  *Id.*  In the mediation sessions, Nationstar offered Ms. Hunter a loan modification.  *Id.*  Ms. Hunter declined the offer.  *Id.* at 12.

On July 29, 2016, Plaintiffs filed a complaint in King County Superior Court, and on November 4, 2016, BANA removed the case to this Court.  Dkt. # 1.  A foreclosure sale on the property was scheduled for January 6, 2017.  Dkt. # 15 at 2.  Plaintiffs, Nationstar, and HSBC stipulated to an entry of a preliminary injunction enjoining the foreclosure sale of the property subject to monthly payments of $3,226.72 into the Court's registry.  Dkt. # 15.  On December 5, 2016, the Court granted the stipulated motion.  Dkt. # 18.  On May 4, 2018, Plaintiff filed a Third Amended Complaint, Dkt.

ORDER – 5

# 51, which HSBC and Nationstar subsequently moved to dismiss, Dkt. # 56. The Court granted in part and denied in part Defendants' motion. Dkt. # 61.

On May 14, 2020, Plaintiffs filed this motion for partial summary judgment on some of the remaining claims against BANA, Nationstar, and HSBC. Dkt. # 76. Each defendant responded and filed its own motion for summary judgment. Dkt. ## 89-91, 93.

### III.  LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the non-moving party's case. *Celotex Corp.*, 477 U.S. at 325. If the moving party meets the initial burden, the opposing party must set forth specific facts showing that there is a genuine issue of fact for trial to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000).

However, the nonmoving party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). Uncorroborated allegations and "self-serving testimony" will not create a genuine issue of material fact. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002); *T.W. Elec. Serv. v. Pac Elec. Contractors Ass'n*, 809 F. 2d 626, 630 (9th Cir. 1987). The court need not, and will not, "scour the record in search of

ORDER – 6

a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996); *see also White v. McDonnel-Douglas Corp.*, 904 F.2d 456, 458 (8th Cir. 1990) (explaining that the court need not "speculate on which portion of the record the nonmoving party relies, nor is it obliged to wade through and search the entire record for some specific facts that might support the nonmoving party's claim"). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis original).

## IV.    DISCUSSION

Plaintiffs Elaine and Keith Hunter seek partial summary judgment against BANA, Nationstar, and HSBC (collectively "Defendants") for violations of the Washington Consumer Protection Act ("CPA"), reserving the issue of damages for trial.  Dkt. # 76 at 7.  Plaintiff Elaine Hunter, individually, also seeks partial summary judgment against BANA for breach of contract, reserving the issue of damages for trial. *Id.*  BANA filed a motion for summary judgment on Plaintiffs' claims for violation of the CPA, breach of contract, and breach of the implied covenant of good faith and fair dealing brought against it.  Dkt. # 90 at 2.  Nationstar filed a cross-motion for summary judgment as to Plaintiffs' CPA, breach of contract, and duty of good faith and fair dealing claims brought against it.  Dkt. # 91.  HSBC filed a cross-motion for summary judgment on Plaintiffs' CPA claim brought against it.  Dkt. # 93.  The Court considers the parties' arguments in turn.

### A.    Claims Against BANA

#### 1.    *CPA Claim Against BANA*

Plaintiffs allege that BANA violated the CPA.  Dkt. # 76 at 19-24.  BANA argues that Plaintiffs' CPA claim is untimely.  Dkt. # 89 at 9.  The Court has already rejected this argument in its prior order but will briefly address it here.  *See* Dkt. # 27 at 4.  Raised initially in its motion to dismiss, BANA's argument is that the CPA claim's four-year

ORDER – 7

statute of limitations began to run in November 2011, when BANA first rejected one of Plaintiffs' payments. Dkt. # 89 at 9. The argument still, however, fails to address the Court's previous finding that the statute had been tolled pursuant to the discovery rule. *See* Dkt. # 27 at 4-5. Under that rule, the statute was tolled until Plaintiffs knew or should have known the essential elements of the cause of action. *Id.* (citing *Matter of Estates of Hibbard*, 826 P.2d 690, 694 (Wash. 1992)); *see also Pruss v. Bank of Am. NA*, No. C13-1447 MJP, 2013 WL 5913431, at *2 (W.D. Wash. Nov. 1, 2013) ("Under [the 'discovery rule'], fraud is considered discovered when, with the exercise of reasonable diligence, it could have been discovered.").

Plaintiffs alleged that they could not have known that they had a CPA claim until August 2012 when BANA representative Paul D. Mills informed them that BANA had sold the Note, that they could not move forward with the loan modification application they had worked on with him, and that BANA subsequently characterized their loan as in default. Dkt. # 27 at 4. Before then, Plaintiffs believed that BANA was modifying their loan and that the returned mortgage payments were merely the result of internal miscommunications. *Id.* at 4-5. BANA does not dispute Plaintiffs' allegations or provide any evidence to undermine Plaintiffs' evidence demonstrating that they had been working on a loan with a BANA representative for months. The Court therefore again rejects BANA's argument that Plaintiffs' CPA claim is untimely.

To prove a CPA claim, Plaintiffs must establish five elements: "(1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; (5) causation." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533 (Wash. 1986). "[A] claim under the Washington CPA may be predicated upon a per se violation of statute, an act or practice that has the capacity to deceive substantial portions of the public, or an unfair or deceptive act or practice not regulated by statute but in violation of public interest." *Klem v. Washington Mut. Bank*, 295 P.3d 1179, 1187 (Wash. 2013). If an act

ORDER – 8

or practice is not per se unfair or deceptive, the plaintiff must prove that the conduct "is 'unfair' or 'deceptive' under a case-specific analysis of those terms." *Mellon v. Reg'l Tr. Servs. Corp.*, 334 P.3d 1120, 1126 (Wash. Ct. App. 2014). "Failure to satisfy even one of the elements is fatal to a CPA claim." *Sorrel v. Eagle Healthcare*, 38 P.3d 1024, 1027 (Wash. Ct. App. 2002). Parties filing suit under the CPA may recover actual damages, costs, and reasonable attorney's fees. RCW 19.86.090. When the parties do not dispute whether a defendant's conduct occurred, "the question whether those actions give rise to a CPA violation is reviewable as a question of law." *Micro Enhancement Int'l, Inc. v. Coopers & Lybrand, LLP*, 40 P.3d 1206, 1220 (Wash. Ct. App. 2002).

BANA alleges that Plaintiffs fail to provide evidence to support the first, third, fourth, and fifth elements of their CPA claim. The second element, "occurring in trade or commerce" is established where there is a "sale of assets or services, and any commerce directly or indirectly affecting the people of the state of Washington." RCW 19.86.010(2). The term "assets" includes real property. RCW 19.86.010(3). The instant dispute over a loan involving real property in Washington satisfies this second element. The Court will consider the remaining disputed elements in turn.

### a. Unfair or Deceptive Act or Practice

Because the CPA does not define the terms "deceptive" or "unfair," the Supreme Court of Washington "has allowed the definitions to evolve through a gradual process of judicial inclusion and exclusion." *Klem*, 295 P.3d at 1186 (internal quotations and citation omitted). For example, Washington courts have concluded that "[m]isrepresentation of the material terms of a transaction or the failure to disclose material terms violates the CPA." *Bain v. Metro. Mortg. Grp., Inc.*, 285 P.3d 34, 50 (Wash. 2012). "Even accurate information may be deceptive if there is a representation, omission or practice that is likely to mislead." *Id.* at 115 (internal quotations and citation omitted). Indeed, courts have concluded that a defendant "need not affirmatively state an untrue fact to have committed a deceptive practice." *See Stephens v. Omni Ins. Co.*, 159

ORDER – 9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

P.3d 10, 19 (Wash. Ct. App. 2007), *aff'd sub nom. Panag v. Farmers Ins. Co. of Washington*, 204 P.3d 885 (Wash. 2009) (holding that defendant's practice of including miscellaneous service charges unrelated to the mortgage on a mortgage payoff statement "has the capacity to deceive because it creates the misleading appearance that the mortgage cannot be released unless the miscellaneous charges . . . are paid").

Washington courts have also held that neither intent nor actual deception is required to establish that an act is deceptive under the CPA.  *Id.*  Courts have explained that "[a] plaintiff need not show that the act in question was *intended* to deceive, but that the alleged act had the *capacity* to deceive a substantial portion of the public."  719 P.2d at 535 (emphasis original); *see Hangman Ridge*, 719 P.2d 531, 535 (Wash. 1986).  With respect to "unfair" acts, a defendant's act or practice might be unfair "if it offends public policy as established by statutes [or] the common law, or is unethical, oppressive, or unscrupulous, among other things."  *Mellon*, 334 P.3d at 1126.  The Washington Supreme Court has noted that a defendant's act or practice might be "unfair" if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and is not outweighed by countervailing benefits."  *Id.* at 489-90.

Here, the Court finds that, as a matter of law, BANA's undisputed conduct in the form of misrepresentations of the amount due on the loan constitutes unfair or deceptive acts.  Even if the Court were to accept BANA's position that it did not misrepresent the amounts owed, BANA's representations to Ms. Hunter were, at minimum, likely to mislead, which is sufficient to establish deceptive acts under the CPA.  *See* 285 P.3d at 50.  BANA misrepresented to Plaintiffs the amount due on the loan and failed to adequately explain payment adjustments on multiple occasions.  *See* Dkt. # 81 at 2; Dkt. # 92-4; Dkt. # 77-3 at 27.  First, it is undisputed that BANA provided Plaintiffs with incorrect information on November 14, 2011 when it advised Ms. Hunter that she owed $5,060.13 for October 2011 and $5,060.13 for November 2011.  Dkt. # 89 at 5; Dkt. # 81 at 2.  BANA claims that Ms. Hunter's subsequent two payments of $5,060.13 were

"insufficient" payments to bring the loan current based on alternative internal calculations of the amount due for November 2011. Dkt. # 89 at 12-13. The Court finds, however, that BANA's misrepresentation of the amount due to bring the loan current precluded Ms. Hunter from making a "sufficient payment." For even if Ms. Hunter had made a single payment of $10,120.26, she would have still not made a sufficient payment according to BANA because, they contend, she owed $11,991.61 at the time. *Id.* at 13. It was therefore BANA's misrepresentation of the amount due to bring the loan current that precluded Ms. Hunter from bringing her loan current in November 2011.

BANA's attempt to dismiss its own misrepresentation by claiming it had communicated the proper amount owed to Ms. Hunter in a letter several months prior is unsupported and unavailing. *Id.* A closer look of BANA's August 15, 2011 letter to Ms. Hunter reveals inaccuracies and omissions regarding the change in minimum payment and interest rate. Dkt. # 92-4 at 2. Although BANA correctly stated in the letter that Ms. Hunter's interest rate was scheduled for an adjustment on February 1, 2012, BANA later stated that the "New Interest Rate" was 7.25 percent. *Id.* This was not the new interest rate that would go into effect on February; it was the initial fixed interest rate that had been in effect for years, since December 2006. *See* Dkt. # 92-2 at 2.

Furthermore—and contrary to BANA's allegation—BANA failed to adequately explain the payment adjustment in its August 2011 letter. *See* Dkt. # 89 at 12. BANA asserts that it "adequately explained the issue of the Negative Amortization Cap when it sent correspondence to Plaintiffs in August 2011." Dkt. # 89 at 17. It did no such thing. *See* Dkt. # 92-4 at 2-3. BANA did not use the term "negative amortization" at all in the letter. It used the term "NA" when it stated that "[c]hanges in your interest rate are based on the NA," but it did not define the term. *Id.* at 2. Even if the Court were to presume that BANA used "NA" as shorthand for "negative amortization," the letter would have been inaccurate because changes to the interest rate were not, in fact, affected by the negative amortization under the terms of the Note. Dkt. # 92-2 at 2. Only the minimum

payment was changed when the negative amortization cap was reached under the terms of the Note; the interest rate was fixed until February 1, 2012. *Id.*

Moreover, BANA's calculation of the amount due is itself problematic. According to the terms of the Note, the initial monthly minimum payment expired on February 1, 2017 or when the maximum negative amortization was reached, whichever was sooner. Dkt. # 92-2 at 3. The negative amortization cap was $1,150,000. *Id.* at 2. In its August 2011 letter, BANA noted that the anticipated principal balance was $1,147,279.63. Dkt. # 92-4 at 2. In its briefing to the Court, BANA explained that it had determined that the loan would soon reach the negative amortization cap and that Plaintiffs' payments would need to increase. Dkt. # 90 at 4. But this was never communicated to Plaintiffs. Indeed, BANA failed to provide any explanation as to why it chose to change the minimum monthly payment before the maximum negative amortization cap was reached or to why Ms. Hunter could not apply the difference between the anticipated principal balance and the negative amortization cap to her next payment so that it could be reached, pursuant to the terms of the Note. The Court refrains, however, from opining on the correct amount due based on the negative amortization cap, as such a matter is properly reserved for a factfinder who may weigh all the evidence. Still, the Court concludes that BANA's misrepresentation, omissions, and failure to explain the payment adjustment in the August 2011 letter and BANA's undisputed misrepresentation of the amount due in its instruction to Ms. Hunter on November 15, 2011 are sufficient to establish deceptive acts under the CPA.

In addition, while the parties dispute the accuracy of BANA's representations in its subsequent monthly statements or payment coupons with Ms. Hunter, it is undisputed that the outstanding amount provided for the month of February was contradicted by BANA in a March 9, 2012 letter to Ms. Hunter. Dkt. # 77-3 at 27. In the letter, sent in response to Ms. Hunter's inquiry about the outstanding amount due on her loan, BANA indicated that Ms. Hunter owed five monthly payments of $5,060.13 plus late charges

and other fees for a total amount of $26,059.46. *Id.* In its letter, BANA noted that this amount was valid through March 16, 2012. *Id.* This contradicts both the monthly payment amount and the past due amount indicated in the monthly statement for the same period. According to the monthly statement, the monthly interest-only payment due was $4,464.39, not $5,060.13 as indicated in the March letter. *Id.* Ms. Hunter's past due payment amount as of February 28, 2012 was $32,676.60 in the monthly statement, as opposed to the $26,059.46 amount indicated as past due in the letter. Dkt. # 92-10 at 2; Dkt. # 77-3 at 27. These inconsistent calculations are simply irreconcilable: the amount Ms. Hunter owed BANA on March 16, 2012 was less than the amount owed on February 28, 2012 even though BANA had refused to accept any payments from Ms. Hunter since November 2011. Based on these undisputed facts, the Court concludes that BANA's repeated misrepresentations of the amount owed by Plaintiffs constitute deceptive acts in satisfaction of the first element of a CPA claim.

Plaintiffs allege that in addition to BANA's misrepresentations, BANA committed a deceptive or unfair act under the CPA when it failed to process Plaintiffs' loan modification or consider alternatives. *See* Dkt. # 76 at 23-24. Because there are disputes of material fact regarding whether Plaintiffs provided all necessary documentation in support of a loan modification and over what was communicated to them by BANA representative Paul D. Mills, the Court cannot conclude as a matter of law that BANA committed a deceptive or unfair act based on the allegation that it failed to process Plaintiffs' loan modification or consider alternatives. *See id.*; Dkt. # 89 at 7-8. The Court therefore denies summary judgment to both parties on this claim based on allegations that BANA committed a deceptive or unfair act by failing to process Plaintiffs' loan modification or consider alternatives.

### b. Public Interest Impact

In a private action in which an unfair or deceptive act is alleged under the CPA, a plaintiff may establish the element of public interest impact by showing that the act had

the capacity to injure other persons.  RCW 19.86.093(3).  In *Bain v. Metropolitan Mortgage Group*, the Supreme Court of Washington concluded that because a defendant was involved with a significant number of mortgages across the country, a finding that its language was unfair or deceptive "would have a broad impact."  285 P.3d at 51. Similarly, because BANA's omissions and misrepresentations are not uniquely limited to a single incident, the Court reiterates its conclusion that such conduct would have a broad impact.  *See* Dkt. # 27 at 5-6.  The element is satisfied here.

### c. Injury

Injuries compensable under the CPA "are relatively expansive."  *Frias v. Asset Foreclosure Servs., Inc.*, 334 P.3d 529, 538 (Wash. 2014).  Under the CPA, a plaintiff can prove injury based on unlawful debt collection practices even where there is no controversy as to the amount or validity of the underlying debt.  *Panag v. Farmers Ins. Co.*, 204 P.3d 885 (Wash. 2009).  Where "a business demands payment not lawfully due, the consumer can claim injury for expenses he or she incurred in responding, even if the consumer did not remit the payment demanded."  334 P.3d at 538.  A plaintiff can satisfy the injury element by showing that the plaintiff's "property interest or money is diminished because of the unlawful conduct even if the expenses caused by the statutory violation are minimal."  *Panag*, 204 P.3d at 899 (quoting *Mason v. Mortg. Am., Inc.*, 792 P.2d 142 (Wash. 1990)).  This can include "[i]nvestigative expenses, taking time off from work, travel expenses, and attorney fees."  *Walker v. Quality Loan Serv. Corp. of Wash.*, 308 P.3d 716 (Wash. 2013).  Finally, "[t]he injury element can be met even where the injury alleged is both minimal and temporary."  *Frias*, 334 P.3d at 538.

There is no dispute that Plaintiffs' account went into default for making insufficient payments, Dkt. # 89 at 6, which were based on BANA's deceptive communications.  This Court has already held that such default constitutes injury for a CPA claim.  *See* Dkt. # 27 ay 6.  Accrued interest, late charges, and property inspection

ORDER – 14

1    fees constitute injury as well.  *See* Dkt. # 76 at 16-17; Dkt. # 100 at 10.  Plaintiff has
2    satisfied the injury element of the CPA claim.

3              *d. Causation*

4              With respect to causation, Plaintiffs must establish that BANA's deceptive acts
5    were the proximate cause for Plaintiffs' injury.  *See Indoor Billboard/Washington, Inc. v.*
6    *Integra Telecom of Washington, Inc.*, 170 P.3d 10, 22 (Wash. 2007).  Under the
7    proximate cause standard, Plaintiffs must establish that "but for the defendant's unfair or
8    deceptive practice, [the plaintiff] would not have suffered an injury."  *Id.*  BANA argues
9    that "[i]t was Plaintiffs' failure to make those payments, not any alleged
10   miscommunication or miscalculation from BANA that resulted in Plaintiffs' ongoing
11   default."  Dkt. # 89 at 10.  The Court disagrees.

12             BANA told Ms. Hunter an amount to pay in November and then rejected payment
13   of that amount.  As discussed above, it was BANA's misrepresentation of the amount due
14   to bring the loan current that precluded Ms. Hunter from making a "sufficient payment."
15   Subsequent misrepresentations of payment and failures to explain payment due
16   perpetuated the default and precluded Plaintiffs from bringing their loan current.  The
17   undisputed evidence here demonstrates that Plaintiffs repeatedly inquired with BANA
18   about the correct amount to pay on their loan to bring it current and continued to make
19   payments of interest due despite the fact that BANA rejected payment.[2]  The Court
20   concludes that there is no genuine dispute as to causation: BANA's deceptive acts were
21   the proximate cause of Plaintiffs' injury.

22             Having satisfied the fifth and final element of their CPA claim with respect to the
23   above allegations, Plaintiffs are entitled to summary judgment on this claim with respect
24   to these allegations.  The Court **GRANTS** summary judgment to Plaintiffs on the CPA

25
26   [2] Although BANA contends that it was not required to accept Plaintiffs' payments, the
     Court does not understand why payments were not accepted, particularly given the fact
27   that Plaintiffs have already paid a total of $164,562.92 into the Court registry as of the
     date of this Order.  *See* Dkt. # 18.
28   ORDER – 15

claim with respect to BANA's misrepresentations of the amounts due to bring the loan current. The Court **DENIES** summary judgment to both parties on the CPA claim based on allegations that BANA refused to process Plaintiffs' loan modification application or consider alternatives.

### 2.    *Breach of Contract Claim Against BANA*

Ms. Hunter contends that BANA breached the terms of the Note when it failed to provide notice of the approaching negative amortization cap, the adjusting interest rate, and payment options. Dkt. # 76 at 29. Ms. Hunter claims that BANA also breached the Note by failing to correctly calculate the November 2011 payment in light of the amount remaining in the negative amortization cap and by refusing to accept payments on the loans. *Id.* Finally, Ms. Hunter argues that Plaintiffs' "underpayments" should have been accepted based on the doctrines of waiver and estoppel. *Id.*

BANA claims that it "adequately explained the issue of the Negative Amortization Cap when it sent correspondence to Ms. Hunter in August 2011 and when Mr. Mills spoke with Plaintiffs in January 2012." Dkt. # 89 at 17. BANA also argues that Ms. Hunter was notified each month of the amount past due on Plaintiffs' loan. *Id.* at 18. BANA claims that, under the terms of the Note, BANA had the right to require borrower "to pay immediately in full" when the borrower was in default. *Id.* at 20. Therefore, BANA claims that "even if there was a breach the damages suffered by Plaintiffs, their ongoing default, was not a result of any breach by BANA." Dkt. # 90 at 21.

Under Washington law, a breach of contract claim is established by the following elements: (1) the existence of a contract; (2) a material breach of the contract; and (3) resulting damage. *St. John Med. Ctr. v. State ex rel. Dep't of Soc. & Health Servs.*, 38 P.3d 383, 390 (Wash. Ct. App. 2002). Here, the Note is a contract between Ms. Hunter and—at the time—BANA. The Note requires "notice of any changes in the amount of [the] monthly payment before the effective date of any change." Dkt. # 77-1 at 4. The Court has already concluded that BANA failed to provide accurate or adequate notice of

ORDER – 16

changes in the monthly payment with respect to the August 2011 letter.  Such a failure to provide proper notice constitutes a material breach of the Note's notice requirement. This material breach precluded Plaintiffs from bringing their loan current, resulting in damages in the form of accumulated interest and late charges at minimum.  The Court concludes that the elements of a breach of contract claim have been met here as a matter of law and Plaintiff is entitled to summary judgment on this claim with respect to BANA's failure to provide proper notice of payment changes.

However, the Court is unpersuaded that BANA's failure to provide information about the negative amortization cap in its August 2011 letter is a clear breach of the terms of the Note as a matter of law.  Indeed, the parties dispute whether BANA's representative, Mr. Mills, had adequately discussed the negative amortization issue with Plaintiffs in January 2012.  The existence of material factual disputes on this matter precludes summary judgment on this claim with respect to this allegation.

The Court also concludes that Plaintiff has not demonstrated that BANA breached the Note when it refused to credit Plaintiffs' payments, as this was not prohibited by the Note.  Similarly, Plaintiffs' brief argument about waiver and estoppel, supported by a single case decided over sixty years ago, is insufficient to meet Plaintiffs' burden to affirmatively demonstrate that no reasonable trier of fact could find other than for Plaintiffs on whether waiver and estoppel apply here as a matter of law.  The Court is unpersuaded and denies summary judgment on this issue.

In conclusion, the Court **GRANTS** summary judgment for Plaintiffs on the breach of contract claim with respect to BANA's failure to provide proper notice of payment changes.  The Court **DENIES** summary judgment to both parties on the breach of contract claim based on the allegation that BANA breached the Note because it did not adequately explain the role of the negative amortization cap in the adjustment of payments.  Finally, the Court **DENIES** summary judgment to Plaintiff on the breach of contract claim based on allegations of waiver and estoppel.

ORDER – 17

*3. Breach of the Implied Covenant of Good Faith and Fair Dealing Claim Against BANA*

BANA alleges that it is entitled to summary judgment on Plaintiffs' breach of the implied covenant of good faith and fair dealing claim because it "is derivative of Plaintiffs' breach of contract claim, and fails for the same reasons." *Id.* at 23. BANA claims there is no evidence to support such a claim. *Id.* at 9. Under Washington law, "[t]here is in every contract an implied duty of good faith and fair dealing" that "obligates the parties to cooperate with each other so that each may obtain the full benefit of performance." *Rekhter v. State, Dep't of Soc. & Health Servs.,* 180 Wash. 2d 102, 112–13, 323 P.3d 1036, 1041 (2014).

BANA claims that it "cooperated fully in its servicing of the Loan and handling of the contract," by notifying Plaintiffs of the monthly payment change due to negative amortization in August 2011 and providing the necessary amounts to bring the loan current, among other things. Dkt. # 90 at 24. The Court disagrees. The Court has concluded as a matter of law that BANA breached the terms of its contract with Ms. Hunter when it failed to provide accurate or adequate notice of changes in the monthly payment. Contrary to BANA's assertion, BANA's failure precluded it from meeting its obligation to cooperate with Plaintiffs so that they could obtain the full benefit of performance. The Court therefore **GRANTS** summary judgment for Plaintiffs on this claim.

**B.    Plaintiffs' Claims Against Nationstar**

Plaintiffs filed three actions against Nationstar: (1) a CPA claim; (2) a breach of contract claim; and (3) a breach of the duty of good faith and fair dealing. Dkt. # 91 at 6. Plaintiffs move for summary judgment only on the CPA claim. Dkt. # 76 at 7. Nationstar moves for summary judgment on all three claims. Dkt. # 91 at 6. The Court will consider the claims as raised in each motion below.

ORDER – 18

*1. CPA Claim Against Nationstar*

Plaintiffs allege that Nationstar violated the CPA when it failed to obtain a complete file on the loan in the transfer from its prior loan servicer, ignored the loan modification application that Plaintiffs had submitted to SLS, failed to communicate and consider alternatives to foreclosure as required under the Foreclosure Fairness Act ("FFA") during mediation, and failed to prepare for and participate in mediation in good faith. Dkt. # 76 at 24-25; Dkt. # 102 at 6. Nationstar disputes each allegation. It asserts that there "is no evidence that any documents of information were omitted during the service-transfer." Dkt. # 91 at 7. It claims that it did consider the pending loan modification application but ultimately denied it because Ms. Hunter failed to submit required information. *Id.* Nationstar argues that it considered and communicated alternatives to foreclosure, offering as evidence the "favorable loan modification that would have brought the long-delinquent loan current" that Nationstar offered to Ms. Hunter. *Id.* Finally, points to the absence of any "bad faith" conduct in the mediator's report as evidence that Nationstar met its obligation to act in good faith in the mediation. Dkt. # 91 at 24.

In addition to denying Plaintiffs' factual allegations, Nationstar asserts several legal arguments. Nationstar claims that Plaintiffs cannot establish that its acts are "unfair or deceptive" as a matter of law because Plaintiffs rely on a misinterpretation of various federal statutes. Dkt. # 91 at 15. Nationstar also argues that Plaintiffs cannot meet the injury or causation elements of a CPA claim. *Id.* at 6. Finally, Nationstar argues that Plaintiff Keith Hunter has no standing to assert any claims arising from servicing of the loan because he is not a party to the loan. *Id.*

*a. Unfair or Deceptive Act or Practice*

As an initial matter, the Court rejects Nationstar's argument that Plaintiffs' CPA claim fails because it is based on a misinterpretation of federal statutes. In the Court's prior ruling on Nationstar and HSBC's motion to dismiss, the Court concluded that

ORDER – 19

Plaintiffs had plausibly alleged that Nationstar engaged in unfair or deceptive conduct under federal statutes in satisfaction of a CPA claim.  The Court determined the following:

> The FFA requires that parties engaged in a foreclosure mediation mediate in "good faith." RCW. 61.24.163(10). The FFA also states, in relevant part, that "[i]t is an unfair or deceptive act in trade or commerce and an unfair method of competition in violation of the [CPA] . . . for any person or entity to: (a) [v]iolate the duty of good faith under RCW 61.24.163." RCW 61.24.135. The Court thus concludes that violation of this statute would constitute a *per se* violation of the CPA. Here, Plaintiffs allege that Nationstar did not participate in mediation in good faith because Nationstar (1) did not provide Plaintiffs with accurate information regarding which loss options were available to them; (2) did not identify which options Plaintiffs were eligible for; and (3) did not evaluate, discuss, or offer the loss mitigation options that were actually available to Plaintiffs; and (4) proposed instead that Plaintiffs double their monthly payments.
> Dkt. # 61 at 8 (citing Dkt. # 51 at ¶¶142-46; Dkt. # 58 at 15).

Under RCW 61.24.163(9), the mediation participants "must address the issues of foreclosure that may enable the borrower and the beneficiary to reach a resolution, including but not limited to reinstatement, modification of the loan, restructuring of the debt, or some other workout plan."  Based on Plaintiffs' allegations, the Court concluded that Plaintiffs "adequately set forth a violation of the duty of good faith under RCW 61.24.163, and thus adequately plead an 'unfair or deceptive act' under the CPA."  *Id.* The Court also determined that Plaintiffs "adequately ple[d] violations of federal laws, which could serve as the basis for a CPA claim," such as Nationstar's alleged violation of 12 C.F.R. 1024.41(c)(1)(i)'s requirement that loan servicers evaluate all loan modification applications.  *Id.* at 9.  The Court here reaffirms its conclusion that Plaintiffs' allegations, if true, would satisfy the first element of a CPA claim.

The Court next considers Nationstar's assertion that it is entitled to summary judgment based on the foreclosure mediator's finding that Nationstar did not act in bad faith.  Dkt. # 91 at 24.  Nationstar claims such a finding by the mediator, or lack thereof, is "binding" in this matter.  *Id.* at 24.  The Court disagrees.  First, the record indicates that

ORDER – 20

the mediator made no findings as to good or bad faith with respect to Nationstar's participation in mediation. Dkt. # 97 at 76-78. Second, the statute itself claims states that "[i]n any action to enjoin the foreclosure, the beneficiary is entitled to rebut the allegation that it failed to act in good faith." RCW 61.24.163(14)(a). The Court concludes that the absence of a mediator's finding that Nationstar acted in bad faith does not preclude Plaintiff from making a claim of bad faith in the foreclosure mediation process. *See Krusee v. Bank of Am., N.A.*, No. C13-824 RSM, 2013 WL 3973966, at *3 (W.D. Wash. July 30, 2013) (holding that "allegations concerning bad faith can be made even when the mediator has not so certified").

Next, the Court must consider whether any genuine dispute of material precludes summary judgment on this claim. With respect to Plaintiffs' motion for summary judgment, Plaintiffs must affirmatively demonstrate that no reasonable trier of fact could find other than for Plaintiffs because they have the burden of proof with respect to their CPA claim at trial. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). With respect to Nationstar's motion for summary judgment on this claim, Nationstar can prevail merely by pointing out to the district court that there is an absence of evidence to support Plaintiffs' case. *Celotex Corp.*, 477 U.S. at 325. The Court finds that neither party meets its burden for summary judgment here.

Factual disputes exist as to Plaintiffs' allegations that Nationstar failed to obtain a complete file from the prior loan servicer, that Nationstar ignored Ms. Hunter's loan modification application, and that Nationstar failed to properly consider Plaintiffs for loan modifications for which they were eligible. Dkt. # 76 at 14-16, 24-25; Dkt. # 91 at 16-21. Indeed, the parties' conflicting statements about missing documents and whether loan modifications were available and could have been considered require a weighing of evidence. *See* Dkt. # 91 at 19-21; Dkt. # 102 at 11. Nationstar's argument that no evidence exists to support Plaintiffs' allegations here ignores evidence presented by Plaintiffs, including a deposition by Plaintiffs' housing counselor, Brian Carl, Dkt. # 78

ORDER – 21

at 2-3, expert witness reports by Diane Cipollone, Dkt. 77-1, and Jay Patterson, Dkt. # 77-3, and Nationstar's own deposition, *see* Dkt. # 76 at 14-15, all of which require consideration by a jury. The existence of material factual disputes with respect to allegations of unfair or deceptive practices precludes summary judgment for either party on this issue.

### b. Injury and Causation

Nationstar alleges that it is entitled to summary judgment nonetheless "for the independently-sufficient reason that Plaintiffs cannot demonstrate any injury for purposes of the CPA." Dkt. # 91 at 25. Nationstar argues that interest and charges on the loan were accumulating long before it took over servicing of the loan and they are consistent with the terms of the loan. *Id.* Following this argument, Nationstar contends that Plaintiff cannot establish causation because "[t]here is simply no evidence of any injury connected to Nationstar's conduct." *Id.* at 26.

However, as the Court already noted in its prior order, the injury element in a CPA claim may be met where "a more favorable loan modification would have been granted but for bad faith in mediation." Dkt. # 61 at 10 (citing *Frias*, 334 P.3d 529, 538). Here, similar to the plaintiff in *Frias*, Plaintiffs allege that they were denied the opportunity to obtain a loan modification because Nationstar did not participate in mediation in good faith. Dkt. # 102 at 19. This would establish injury. Because causation is inextricably linked with whether Nationstar committed deceptive or unfair acts, it too requires a factual analysis by a jury and cannot be decided as a matter law.

Based on the factual disputes with respect to the first element of CPA claim, the Court **DENIES** summary judgment to both parties on this claim.

### c. Keith Hunter Standing

Nationstar argues that it is entitled to summary judgment on the CPA claim to the extent it is asserted by Keith Hunter as opposed to Ms. Hunter because he is not a party to the loan. Dkt. # 91 at 26-27. A CPA claim, however, does not have to be "predicated on

ORDER – 22

an underlying consumer or business transaction." *Panag*, 204 P.3d 885, 890 (Wash. 2009).  Indeed, the Supreme Court of Washington has emphasized that the CPA allows "*[a]ny person* who is injured in his or her business or property by a violation" of the act to bring a CPA claim" and that "[n]othing in this language requires that the plaintiff must be a consumer or in a business relationship with the actor." *Id.*  Here, it is undisputed that Keith Hunter had rights to the property, lived on the property, ran a business from it, and made investments on it.  Dkt. # 102 at 21.  Nationstar had met with Keith Hunter to be evaluated for a loan modification to avoid foreclosure on the property and knew that Keith Hunter had been given survival rights to the property.  *Id.*  The totality of circumstances presented to the Court reveals that Nationstar was treating Keith Hunter as someone who was injured in his business or property.  The Court therefore **DENIES** summary judgment to Nationstar on the issue of standing.

   *2.  Breach of Contract & Duty of Good Faith and Fair Dealing Claims Against Nationstar*

   Nationstar claims it is entitled to summary judgment on the two remaining claims for breach of contract and breach of the duty of good faith and fair dealing.  Dkt. # 91 at 27.  Plaintiffs do not move for summary judgment on either claim.

   In their Third Amended Complaint, Plaintiffs allege that Nationstar breached the terms of the promissory note by failing to adjust the interest rate and monthly payments as required.  Dkt. # 51 at 25.  Nationstar alleges that these claims fail because "the evidence established that Nationstar did properly adjust the Loan's interest rate at all times, and because there is no evidence in this record that the Loan did not properly recast."  Dkt. # 91 at 27.  Nationstar claims that the loan "remains due for the November 2011 payment when the interest rate was 7.25 percent, and Nationstar's monthly mortgage statements reflect that reality."  *Id.* at 28.  The Court disagrees.  The monthly mortgage statements do not reflect that the interest rate was 7.25 percent in November 2011, but instead indicate that the interest rate is 7.25 percent "until 03/01/2017."  Dkt.

ORDER – 23

# 77-5 at 62.  This raises questions as to whether Nationstar properly adjusted the interest rate pursuant to the terms of the Note and thereby precludes summary judgment on either of these claims.  *Celotex Corp.*, 477 U.S. at 325.  The Court **DENIES** summary judgment to Nationstar on both claims.

## C.      Claims Against HSBC

### 1. CPA claim

In Plaintiffs' motion for summary judgment, Plaintiffs allege that HSBC violated the CPA when it did not prepare for or participate in the mediation and is liable as the beneficiary for Nationstar's alleged conduct in violation of the CPA pursuant to the FFA.  Dkt. # 76 at 27.  Plaintiffs claim that HSBC is vicariously liable under the CPA because both BANA and Nationstar were HSBC's servicing agents.  *Id.* at 28.

In its cross-motion for summary judgment, HSBC claims that Plaintiffs' CPA claim fails because "the single theory of liability that survived HSBC's prior motion to dismiss—that HSBC was not in possession of the original Note—is contradicted by the record evidence."  Dkt. # 93 at 10.  Moreover, HSBC contends that evidence shows that HSBC held the original note through its agent, Nationstar, "at all relevant times."  *Id.* at 11.  HSBC further argues that Plaintiffs cannot establish an unfair or deceptive act, injury, or causation as required for a CPA claim.  *Id.* at 10-11.  Finally, HSBC asserts that Plaintiffs' vicarious liability theory fails because they cannot prove that HSBC retained the ability to control its servicers.  *Id.* at 11.  HSBC raises the same argument as Nationstar with respect to Keith Hunter's standing in the CPA claim.  The Court incorporates its analysis and conclusion in Nationstar's identical argument above to **DENY** summary judgment on HSBC's argument on this matter.

### a. Possession of the Note

In their Third Amended Complaint, Plaintiffs asserted that HSBC is liable under the CPA because it violated the Deed of Trust Act by not possessing a "hard copy of the original promissory note."  Dkt. # 51 at ¶¶ 208-10.  Plaintiffs do not raise this argument

ORDER – 24

in their motion for summary judgment.  HSBC does raise it, however, seeking summary judgment on the claim that its alleged failure to physically possess the Note constitutes an unfair or deceptive act.

HSBC contends that it has been in physical possession of the original Note via its servicing agent Nationstar from April 18, 2014 to the present.  *Id.* at 12; Dkt. # 77-5 at 2; Dkt. # 97 at 30.  Plaintiffs argue that it is unclear whether Nationstar actually possesses the Note because it has not been produced, Nationstar has refused to identify the chain of custody, and HSBC has not cooperated in providing discovery.  Dkt. # 102 at 25.  While state law requires that a trustee has proof that the beneficiary is the holder of any promissory note, *see* RCW 61.24.030(7), this Court has found that "courts have rejected other plaintiffs' attempts to bring a cause of action based on a beneficiary's failure to produce original notes."  *Mikhay v. Bank of Am., N.A.*, No. 2:10-CV-01464 RAJ, 2011 WL 167064, at *2 (W.D. Wash. Jan. 12, 2011).

Plaintiff argues that even if HSBC is the holder of the Note now, the foreclosure proceedings were initiated in 2012, "when BANA told the Hunters their loan would be referred to foreclosure by HSBC."  Dkt. # 102 at 25.  Because there is a factual dispute about who was in possession of the Note at that time, which is material to Plaintiffs' claim against HSBC, summary judgment cannot be granted on this matter.  The Court **DENIES** HSBC's motion for summary judgment on this matter.

### b. CPA Violation in Connections with Foreclosure Mediation

Under the FFA, the "beneficiary or an authorized agent" must meet with the borrower in person for foreclosure mediation proceedings.  RCW 61.24.163(8)(a).  HSBC affirms that "Nationstar is HSBC's attorney in fact and was its authorized agent to engage in foreclosure mediations on HSBC's behalf."  Dkt. # 93 at 13.  HSBC does not dispute that Nationstar was acting as its agent in the foreclosure mediation.  Instead, HSBC reasserts Nationstar's arguments with respect to Nationstar's allegedly unfair or deceptive acts during the foreclosure mediation.  *Id.* at 12-13.

ORDER – 25

The Court's conclusion that factual issues preclude summary judgment on allegations that Nationstar committed an unfair or deceptive act in the mediation applies here. HSBC's arguments on injury and causation, which reflect the same arguments advanced by Nationstar, are similarly rejected as meritless. The Court therefore **DENIES** HSBC's motion for summary judgment on this issue.

### c. *Vicarious Liability*

Finally, HSBC argues that it is entitled to summary judgment because it cannot be held vicariously liable for the acts of BANA and Nationstar.[3] Dkt. # 93 at 14-15. HSBC contends that a principal is "only liable for the activity of its agent that the principal has the right to control." *Id.* at 14 (citing *Kroshus v. Koury*, 633 P.2d 909, 913 (Wash. Ct. App. 1981) (principal liable only for agent's activities over which principal has a right of control); *see also Stephens*, 159 P.3d at 27 ("The right to control is indispensable to vicarious liability.")). HSBC argues that Plaintiffs have not met their burden to demonstrate that HSBC maintains control over day-to-day servicing of HSBC's servicing agents. Dkt. # 93 at 14. HSBC contends that this is because HSBC's role is limited to "simply overseeing the pool of loans in the trust pursuant to the applicable pooling and servicing agreement." *Id.* at 15. Plaintiffs note that Nationstar too claims that HSBC had no right to control its conduct. Dkt. # 102 at 26.

Because Plaintiffs will bear the burden of proof at trial, HSBC can prevail by pointing out that there is an absence of evidence to support Plaintiffs' argument. *Celotex Corp.*, 477 U.S. at 325. Indeed, Plaintiffs fail to identify any evidence demonstrating that HSBC, in fact, has control over Nationstar in its servicing activities. In the absence of any such evidence, the Court **GRANTS** summary judgment in favor of HSBC on this issue. *See Reisinger v. Deutsche Bank Nat. Tr. Co.*, 174 Wash. App. 1060 (2013)

---

[3] The Court excludes HSBC's liability for Nationstar's specific conduct as its agent in foreclosure mediation proceedings discussed in the preceding section from its discussion of vicarious liability for other acts of BANA and Nationstar in servicing the loan.

ORDER – 26

(holding that summary judgment in favor of beneficiary was proper because the plaintiffs "submitted no evidence of control in their summary judgment materials").

### IV.   CONCLUSION

For the reasons stated above, the Court **GRANTS in part and DENIES in part** Plaintiffs' Partial Motion for Summary Judgment (Dkt. # 76); **DENIES** BANA's Motion for Summary Judgment (Dkt. # 90); **DENIES** Nationstar's Motion for Summary Judgment (Dkt. # 91); and **GRANTS in part and DENIES in part** HSBC's Motion for Summary Judgment (Dkt. # 93).

DATED this 11th day of March, 2021.

The Honorable Richard A. Jones
United States District Judge

ORDER – 27